IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|   |   |
|---|---|
| ROBERT HAHN | ) Civil Action No. 2:09-cv-03639 DRD MAS |
| Plaintiff, | ) |
| v. | ) |
| ONBOARD LLC, JONATHAN BEDNARSH and MARC SIDEN, | ) |
| Defendants. | ) |

**BRIEF OF PLAINTIFF ROBERT HAHN IN SUPPORT OF HIS
MOTION FOR SUMMARY JUDGMENT**

JEFFER HOPKINSON & VOGEL
1600 Route 208 North
P.O. Box 507
Hawthorne, New Jersey 07507
Tel. (973) 423-0100
Fax (973) 423-5614
Attorneys for Plaintiff,
Robert Hahn

MELINDA B. MAIDENS, ESQ.
(E-Mail: mmaidens@jhvlaw.com)
    On the Brief
MM8271

**TABLE OF CONTENTS**

**Index to Brief**

Page

**INTRODUCTION** .............................................. 1

**PROCEDURAL HISTORY** ........................................ 1

**FACTS** .................................................... 4

**LEGAL ARGUMENT** ........................................... 8

**POINT I**

Summary judgment should be awarded to plaintiff
dismissing defendant's Counterclaim ...................... 8

**POINT II**

Defendant has not presented evidence of a genuine
issue of material fact requiring trial on the
First Cause of Action of its Counterclaim ................ 10

    1.   **Soliciting clients to leave OnBoard** ............. 11

    2.   **Diverting assets and business opportunities
       at the Arizona Conference** ....................... 13

    3.   **Advertising "new" business at the
       Arizona Conference** .............................. 18

    4.   **False expense reports** .......................... 20

    5.   **Registering a Website and a domain name
       using an OnBoard computer and/or an
       OnBoard account** ................................. 21

    6.   **Conducting business for 7DS Associates, LLC
       and notorious-rob.com during working hours** ....... 21

**POINT III**

Because defendant has not produced any evidence
that plaintiff used or disseminated any
confidential information, the second and third
counts of defendant's Counterclaim
must be dismissed ....................................... 23

**POINT IV**

None of the acts alleged, even if they occurred,
meet the definitions of "cause" as provided in
the Employment Agreement so as to deprive
plaintiff of his severance pay ............................   26

**POINT V**

Plaintiff is entitled to summary judgment
awarding him three months severance pay ...................   32

**CONCLUSION** ...................................................   34

## Cases Cited

Anderson v. Liberty Lobby, Inc,
477 U.S. 242, 106 S. Ct. 2505,
91 L.Ed.2d 202 (1986) .......................................   8

Celotex Corp. v. Catrett,
477 U.S. 317, 106 S. Ct. 2548 (1986),
91 L.Ed.3d 265 (1986) .......................................   8

EED Holdings v. Palmer Johnson Acquisition Corp.,
387 F. Supp. 2d 265, 278 (S.D.N.Y. 2004) ..................   27

Gallo v. Prudential Residential Servs., Ltd. P'ship,
22 F.3d 1219, 1224 (2d Cir. 1994) ..........................   30

Guardian Music Corporation v.
James W. Guercio Enterprises, Inc.,
459 F. Supp 2d 216, 220 (S.D.N.Y. 2006) ...................    9

Harlem Wizards Entertainment Basketball, Inc. v.
NBA Props., Inc.
952 F.Supp. 1084, 1091 (D.N.J. 1997) ......................   24

Illingworth v. Nestle U.S.A., Inc.
926 F. Supp. 482, 487 (D.N.J. 1996) .......................   30

Kemelhor v. Penthouse International, Ltd.,
689 F. Supp. 205, 213-214 (S.D.N.Y. 1988) ............... 32, 33

Natural Resources Defense Counsel v. Texaco,
906 F.2d 934, 941 (3d Cir.1990) ............................  24

Pepe v. Rival Company,
85 F. Supp. 2d 349, 380 (D.N.J. 1999)
Affirmed 254 F.3d 1078 (3d Cir. 2001) .....................  26

Pitak v. Bell Atlantic Network Services, Inc.,
928 F.Supp 1354, 1365-1366 (D.N.J. 1996) .................. 8, 9

Readco, Inc. v. Marine Midland Bank,
81 F.3d 295, 299 (2d Cir. 1996) ......................... 26, 27

Rondeau v. Mosinee Paper Corp.,
422 U.S. 49 (1975) .......................................  24

## Statutes and Rules of Professional Conduct Cited

Rule 4:9-1 ...............................................  1

Fed. R. Civ. P. 56(c) ...................................  8

## Introduction

Plaintiff, Robert Hahn, submits this brief in support of his motion for summary judgment dismissing defendant's Counterclaim and awarding plaintiff judgment on his Second Amended Complaint. At issue in this action is plaintiff's entitlement to his severance pay, which is due him as result of the termination of his employment with defendant, OnBoard, LLC ("OnBoard"), and which defendant has refused to pay.

## Procedural History

Plaintiff's initial complaint was filed on June 3, 2009, in the Superior Court of New Jersey, Law Division, Essex County, docket number L-4486-09. *Affidavit of Melinda B. Maidens, sworn September 21, 2010 ("Maidens Aff."), Exhibit "N,"* seeking both payment of his severance and a declaratory judgment confirming his other post-employment rights. Plaintiff filed an amended complaint on June 15, 2009, pursuant to the New Jersey Rules of Court, *R. 4:9-1. Id., Exhibit "O."* After service of the amended complaint on defendants[1] but prior to the time for filing and serving responsive pleadings under the New Jersey Rules of Court, defendants filed a Notice of Filing of Removal, automatically removing the action to the Federal District Court for the District of New Jersey, on July 22, 2009. *Id., Exhibit*

---

[1] Counts Two and Three of plaintiff complaint alleged causes of action against the individual officers of OnBoard; however, those claims were dismissed on motion, leaving only OnBoard as defendant.

"*P.*"

On July 28, 2009, defendants filed a Notice of Motion to Dismiss Amended Complaint for Failure to State a Claim upon Which Relief Can Be Granted. Plaintiff filed opposing papers and the motion was heard before Judge Dickinson R. Debevoise on September 8, 2009. On November 16, 2009, Judge Debevoise issued an Opinion and Order dismissing the Amended Complaint, including the claim for declaratory relief, but conditioning dismissal of the First Count upon payment to plaintiff of his three months severance pay. *Maidens Aff., Exhibit "Q."* Defendants objected to paying the severance and therefore, the First Count remains in litigation. Defendant filed an Answer and Verified Counterclaim on December 18, 2009, after the parties had entered into a stipulation extending the time to respond. Plaintiff served his Verified Answer and Affirmative Defenses to Counterclaim on January 7, 2010, and discovery commenced.

On July 30, 2010, a Consent Order was filed allowing the parties to amend their respective pleadings. Defendant's Answer and Verified Counterclaim, which added two counts, was filed on August 4, 2010. Plaintiff's Second Amended Complaint was filed on August 5, 2010. Plaintiff filed an answer to the Amended Counterclaim on August 30, 2010. No answer appears to have been filed in response to the Second Amended Complaint. Discovery is complete: the parties have exchanged interrogatories and

2

document production and have taken the depositions of Robert Hahn, Jonathan Bednarsh, OnBoard's president and chief operating officer, and Marc Siden, OnBoard's chief executive officer.

## FACTS

From September 19, 2007, until May 5, 2009, Robert Hahn was employed by OnBoard as vice president of marketing. He had been recruited to join OnBoard while working at Realogy Corporation, where he was senior vice president for interactive marketing. *Deposition of Robert Hahn, June 23, 2010 ("Hahn Dep.") at 17.* A corporate recruiter brought OnBoard to his attention; the company at that time had been in business for only six years. OnBoard provides technology, information and related services to companies in real estate, publishing, marketing and financial services. *Deposition of Jonathan Bednarsh, June 29, 2010 ("Bednarsh Dep.") at 16. (Maidens Aff. Exhibit "B").*

The prospect of participating in a new and growing venture was attractive, and OnBoard offered Hahn a tempting compensation package, which included an annual base salary of $120,000.00, quarterly bonuses and medical benefits and, most significantly for Hahn, the right to a substantial "golden parachute" payment in the event his employment ended as a result of a corporate reorganization, its acquisition by another company, a public offering or a dissolution. The terms of his employment were set forth in a written agreement (the "Employment Agreement"), executed on September 19, 2007. *(Maidens Aff., Exhibit "C").*

As provided by the Employment Agreement, Hahn's status was that of an "at-will" employee, with no guarantee that he would

4

remain employed for any specific period and with the express provision that OnBoard could terminate his employment at any time, for any reason. *Employment Agreement, ¶7. (Maidens Aff., Exhibit "C")*. As a condition for his acceptance of that status with the concomitant risk that he could be fired at any time, Hahn bargained for and obtained OnBoard's agreement to include a compensation package if he were let go without cause. The package comprised three months of severance pay and the future payment rights described above, termed "Exit Event" rights. *Employment Agreement ¶2.1; (Maidens Aff., Exhibit "C")*.

The amount of the Exit Event payment to which Hahn would be entitled was a percentage of the value of OnBoard at the time the Exit Event occurred. The percentage itself depended upon the length of his employment with OnBoard. If his employment was terminated without cause at any time after six months, his Exit Event rights would survive, but OnBoard could opt to buy them back. *Id., ¶7.4.* Hahn would forfeit his Exit Event rights if he left his job voluntarily or was terminated for cause after six months. *Employment Agreement, ¶¶7.1, 7.2; (Maidens Aff., Exhibit "C")*.

Because Hahn's status was "at will," he was concerned to protect himself against arbitrary deprivation of his Exit Event rights. He negotiated with OnBoard for precise definitions and examples of "cause," which are set forth in the Employment

Agreement as follows:

(i)   an intentional act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of your employment with company;

(ii)   intentional damage to companies [sic] assets;

(iii)  intentional disclosure of company's confidential information contrary to companies [sic] policies;

(iv)   intentional engagement in any competitive activity which would constitute a breach of your duty of loyalty or of your obligations under this agreement;

(v)   willful conduct by you that is demonstrably and materially injurious to company, monetarily or otherwise.

For purposes of this paragraph, and [sic] act, or a failure to act, shall not be deemed willful or intentional, as those terms are defined herein, unless it is done, or omitted to be done, by you in bad faith or without a reasonable belief that your action or omission was in the best interest of company. Failure to meet performance standards or objectives, by itself, does not constitute "Cause".

*Employment Agreement, ¶7.6; (Maidens Aff., Exhibit "C").*

Hahn had no reason to expect that his future with the company would be anything other than productive and satisfying. On May 5, 2009, he met with Siden and Bednarsh for what he expected would be a routine status meeting; however, he was treated to a savage denunciation of his performance, replete with accusations of insubordination and disloyalty. His resignation was demanded, which he refused to tender. Finally, he was told to leave "immediately." *Hahn Dep. at 94-99;*

*(Maidens Aff., Exhibit "E")*.

Hahn did not voluntarily resign his employment; he was dismissed. He was aware that at the time of his termination, the company's estimated valued was around $15 million, which would have made his Exit Event rights worth $132,000.00 if an Exit Event had occurred at that time. He was also entitled to immediate payment of three months of salary as severance, for a total of $30,000.00. OnBoard has refused to pay his severance and is attempting after the fact to create the impression that there was "cause" for his termination. Knowing that Hahn could not reasonably be expected to resign and thereby forfeit his severance and his Exit Event rights, OnBoard has concocted charges against him based on the flimsiest of allegations, allegations that cannot survive scrutiny on a motion for summary judgment.

## Legal Argument

### POINT I

**Summary judgment should be awarded to plaintiff dismissing defendant's Counterclaim.**

"Summary judgment should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 106 *S. Ct.* 2505, 91 *L.Ed.*2d 202 (1986). Summary judgment may be entered against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 *U.S.* 317, 106 *S.Ct.* 2548 (1986), 91 *L.Ed.*3d 265 (1986).

In *Pitak v. Bell Atlantic Network Services, Inc.* 928 *F.Supp.* 1354 *(D.N.J.* 1996), the District Court held that

Although the summary judgment hurdle is difficult to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has demonstrated the absence of a genuine issue of material fact,

its opponent must do more than simply show

8

> that there is some metaphysical doubt as to
> the material facts. In the language of the
> Rule, the nonmoving party must come forward
> with "specific facts showing that there is *a
> genuine issue for trial.*" Where the record
> taken as a whole could not lead a rational
> trier of fact to find for the non-moving
> party, there is no "genuine issue for trial.
>
> ...
>
> In other words, "the inquiry involves determining
> "'whether the evidence presents a sufficient
> disagreement to require submission to a jury or
> whether it is so one-sided that one party must prevail
> as a matter of law.'"

*Id. at 1365-1366* (emphasis in original)(citations omitted).

In much the same language as that of the New Jersey District Court in *Pitak, supra,*, the Southern District Court of New York held in *Guardian Music Corporation v. James W. Guercio Enterprises, Inc.,* 459 F. Supp. 2d 216, (S.D.N.Y. 2006) that

> a party must raise a genuine issue of material fact
> that 'does not rely on conclusory allegations or
> unsubstantiated speculation' and raises more than a
> '"metaphysical doubt as to the material facts."'.

*Guardian Music,* 459 F. Supp. 2d at 220 (citations omitted). In this action, the undisputed material facts do not support a finding of any "cause," as that term is defined in the Employment Agreement, for Hahn's termination and the consequent deprivation of his severance.

**POINT II**

**Defendant has not presented evidence of a genuine issue of material fact requiring trial on the First Cause of Action of its Counterclaim.**

In the first cause of action of the counterclaim, OnBoard alleges seven acts by plaintiff that, it claims, constitute "cause" as that term is defined in the Employment Agreement. These seven alleged acts are: (1) soliciting OnBoard clients for Hahn's own business purpose; (2) diverting assets of and business opportunities of OnBoard at a business conference held March 24-28, 2008, in Scottsdale, Arizona (the "Arizona Conference"); (3) advertising a personal business at the Arizona Conference; (4) submitting false expense reports; (5) registering a personal Website using an OnBoard computer; (6) registering a domain name, "www.7DSassociates.com," using an OnBoard account; and (7) conducting personal business during working hours. *Answer and Verified Counterclaim, filed August 4, 2010, ¶46 ("Answer"); (Maidens Aff., Exhibit "G").*

OnBoard has produced no evidence – not even the requisite "scintilla" –for the existence of at least five of these alleged acts and no basis for a claim that two of the acts breached any express or implied contractual duty owed by plaintiff to defendant, let alone met the definition of "cause" as provided in the Employment Agreement.   The seven alleged acts will be

10

addressed in turn.

**1. Soliciting clients to leave OnBoard.**

The only evidence of this alleged act concerns one OnBoard client, referred to in the amended Counterclaim as "a Washington D.C.-based multiple listing service." *Answer, p. 10, ¶20, (Maidens Aff.*, Exhibit "G"). Bednarsh identified the client as Metropolitan Regional Information Systems, Inc. ("MRIS"). *Bednarsh Dep. at 22-23 (Maidens Aff., Exhibit "B")*. No other "solicited" clients were identified by OnBoard. The uncontroverted facts produced in discovery reveal that MRIS became a client of OnBoard in 2008, after Hahn was hired. *Deposition of Marc Siden, June 30, 2010 ("Siden Dep.") at 10-11; (Maidens Aff., Exhibit "D"); ("Siden Dep.") at 18 (Maidens Aff., Exhibit "D")*. Hahn had no direct contact with the company as part of his employment duties with OnBoard. *Hahn Dep. at 302-303, (Maidens Aff., Exhibit "E")*. There is some indication that he gave a blog card to an MRIS representative at the Arizona Conference, *id. at* 303, but in any event, the record is undisputed that MRIS remained a client of OnBoard after Hahn was dismissed on May 5, 2009.

MRIS did not terminate its relationship with OnBoard until December 15, 2009, more than five months after the termination of Hahn's employment. In discovery OnBoard produced a letter dated December 15, 2009, from Danielle Blanchard of MRIS,

11

notifying OnBoard of its decision to terminate its contract. Upon receiving the letter, Siden testified that he inquired with MRIS as to the reason for the termination and was advised that the decision was the result of "new leadership." *Siden Dep. at 24 (Maidens Aff., Exhibit "D"); Bednarsh Dep. at 35 (Maidens Aff., Exhibit "B"); see MRIS letter, (Maidens Aff., Exhibit "J").* No other evidence has been produced regarding the decision by MRIS to terminate its contract with OnBoard – certainly no evidence that Hahn was in any way responsible.

Approximately two months after Hahn was dismissed, he was contacted by MRIS with a request to provide consulting services. *Hahn Dep. at 304 (Maidens Aff., Exhibit "E").* Hahn was briefly employed by MRIS from January 2010 through May 2010. *Id. at 312-313.* Currently, MRIS is a client of Hahn's consulting business. *Id. at 10-11.* This relationship did not arise until after the termination of Hahn's employment by OnBoard. Bednarsh testified to a belief that Hahn "had discussions" with MRIS representatives at the Arizona Conference, *Bednarsh Dep. at 23 (Maidens Aff., Exhibit "B")*, but his belief is of no evidentiary import. The unambiguous facts are that MRIS became a client of OnBoard in 2008; Hahn's employment was terminated on May 5, 2009; and MRIS remained a client of OnBoard until December 2009. This is the only evidence before the Court relating to OnBoard's claim that Hahn attempted to woo clients away from OnBoard while

still employed. This evidence is insufficient as a matter of law to support this claim, which must therefore be dismissed on summary judgment.

## 2. Diverting assets and business opportunities at the Arizona Conference.

OnBoard's complaints about Hahn's acts at the Arizona Conference are: (1) not being present at the company's booth and (2) handing out "personal business cards" (in fact, a "blog" card, *see p.14, infra*). *Bednarsh Dep. at 25-26 (Maidens Aff., Exhibit "B"); Siden Dep. at 60-61 (Maidens Aff. Exhibit "D").* Hahn testified that at the conference he did the following: (1) held a focus group for consumers; (2) participated in sales meetings, (3) helped set up OnBoard's display booth, and (4) spoke to visitors at the booth. *Hahn Dep. at 248-253 (Maidens Aff., Exhibit "E").*

The claim that Hahn "diverted" business opportunities from OnBoard cannot be sustained without some evidence of what opportunities he should have produced from the conference. Siden testified that OnBoard representatives are not assigned a quota of leads to bring back from any particular conference and that they are not required to attend a specific number of meetings at any particular conference. He admitted that OnBoard does not keep statistics on the number of leads that a representative would be expected to generate from any one

13

conference.  *Siden Dep. at 16-18 (Maidens Aff., Exhibit "D").* Without evidence of what should have resulted from Hahn's efforts at the Arizona Conference and without evidence of what business OnBoard might have received "but for" Hahn's alleged activities, OnBoard has not produced material evidence to support its claim that Hahn "diverted" opportunities from OnBoard and this claim must be dismissed on summary judgment.

OnBoard persists on this claim, however, citing Hahn's blog cards. These cards are smaller than a standard business card and contain Hahn's name, the Web address for his Web log ("blog"), "notorious-rob.com," his email, cell phone and Twitter contact information. *See Maidens Aff., Exhibit "F."* Hahn explained at his deposition that "notorious-rob.com" is "a Web log, a website where I post my opinions, thoughts." He was asked:

> Q.  Is it a business?
>
> A.  No.
>
> Q.  Do you make money from it?
>
> A.  No.
>
> Q.  So the purpose is for what?
>
> A.  Just to communicate with the world and have conversations.

*Hahn Dep. at 82.  (Maidens Aff., Exhibit "E").*

Later on, he explained his purpose in handing out cards with the

Website for his blog:

>    Q.   Well, did you have cards printed up that
> said "Notorious R.O.B." on them?
>
>    A.   Yes.
>
>    …
>
>    Q.   And you passed them out?
>
>    A.   Yes.
>
>    Q.   And how it that related to OnBoard?
>
>    A.   Because Notorious R.O.B. was a channel and a
> methodology for OnBoard.

*Hahn Dep. at 254-255.   (Maidens Aff., Exhibit "E")*

Both Siden and Bednarsh were well aware of the existence of "notorious-rob.com" during Hahn's employment and at no time ordered him to cease blogging, even after receiving complaints from a client about comments that he had posted.   Bednarsh testified that:

> A.   I recall one specific instance when we had a
> client complain to us about things that Rob had posted
> on his blog which were critical of that client.   …   So
> Marc and I spoke to him and Rob initially was
> resistant to even consider our prospective [sic] on
> that and he agreed to remove that offending post from
> his blog and he did.
>
> Q.   Who was the client?
>
> A.   Coldwell Banker.
>
> …
>
> Q.   All right.   Did Coldwell terminate its business

with Onboard [sic] as a result of that blog?

A.    No.

Q.    Anyone at Coldwell send any letter to Onboard [sic] about the blog?

...

A.    No.

*Bednarsh Dep. at 30-31. (Maidens Aff., Exhibit "B").* Coldwell Banker was the only client to register any complaint as a result of the blog. *Id. at 39.*

Bednarsh had defended "notorious-rob.com" to Siden. Siden testified that at the time of Coldwell Banker's complaint, he wanted Hahn to terminate the blog:

Q.    And ... isn't it a fact that you spoke to Mr. Hahn about that complaint by Coldwell?

A.    That is correct.

Q.    At that time did you tell him to shut down the blog?

A.    Personally, I wanted him to but John [Bednarsh] fought me on that and I conceded.

Q.    And what was ... John's position with respect to the blog?

A.    Well, at a higher level it was his reminding me of the culture that I had set up here at this company to allow people to live their lives and not be "slaves" of their job.  So I agreed with him and as it related to Rob's blog provided that he is not damaging our company that he should be entitled to do it.

*Siden Dep. at 42. (Maidens Aff., Exhibit "D").*

Bednarsh not only defended the blog, he at one point agreed with the opinions Hahn was expressing. At the beginning of April 2009, Coldwell Banker lodged a second complaint with OnBoard about "notorious-rob.com." After receiving the call from Coldwell, Bednarsh emailed Siden that:

> I got one of those calls again from [redaction] concerned about "loose cannon" Rob Hahn upsetting people by picking on [redacted] a client of ours. I don't think he's off base, but it is a lack of sensitivity towards a sensitive, important, [sic] client. Let's discuss – don't bring this up with him yet.

*Copy of email dated April 2, 2009, marked P-7 at Bednarsh Dep.; (Maidens Aff. Exhibit "H").* OnBoard was concerned solely with the effect on its clients of comments posted on the blog. Nothing in Siden's or Bednarsh's testimony or in their communications with each other suggests that either man viewed "notorious-rob.com" as a business competitor.

One month later, in a memorandum dated May 5, 2009 ("Siden Memorandum") regarding Hahn's performance, Siden wrote, "I <u>now</u> firmly believe that [plaintiff's] personal blog is in direct conflict with his position … and request that he refrain from these outside activities so that he can focus 100% on his responsibilities here at Onboard [sic]." *See Siden Memorandum, (Maidens Aff., Exhibit "I")* (emphasis added). The Siden Memorandum was drafted on May 4, 2009, more than one year after the Arizona Conference in March 2008 and a month after Coldwell

Banker's second complaint. Although dated May 5, 2008, the day of Hahn's meeting with Siden and Bednarsh at which his employment was terminated, it had been drafted the day before. *Bednarsh Dep. at 68-69.* (*Maidens Aff., Exhibit "B"*). Siden criticizes the blog on two grounds: (1) Coldwell Banker's complaints and (2) Siden's belief that Hahn was spending time on the blog to the detriment of his employment duties. Significantly, Siden does not state that the blog represented a business venture of Hahn's in competition with OnBoard or was a means by which Hahn diverted business opportunities from OnBoard.

Given the facts, the claim that Hahn diverted OnBoard assets and business opportunities by passing out his blog card at the Arizona Conference is not supported by any evidence produced in this action and must be dismissed on summary judgment.

**3.   Advertising "new" business at the Arizona Conference.**

For the reasons cited above with reference to "notorious-rob.com", this claim must also be dismissed on summary judgment. OnBoard's claim rests only on the blog, which is not a business, let alone a competing business. It was, instead, one of Hahn's ideas for promoting OnBoard during his employment. At his deposition, he explained:

Q.   And what purpose did you give each of those

individuals the card for?

A.    Because they're bloggers.    They're interested in
social media, and this is a blog card.

Q.    Well, what OnBoard purpose did you give them the
card for?

...

A.    Marketing and promotion and branding.

Q.    Of OnBoard?

A.    Yes.

Q.    Well, what specific marketing and promotion
for Onboard?

A.    The more that people get to know that particular
blog, and the fact that I am the VP of marketing at
OnBoard, … was going to be to the benefit of OnBoard.

*Hahn Dep. at 275-276.    (Maidens Aff., Exhibit "E").*    OnBoard has

produced no evidence that anyone outside OnBoard perceived of

Hahn's blog as a vehicle for any personal business of Hahn, let

alone a competing business.    OnBoard therefore cannot maintain a

cause of action based upon the blog cards or the blog.

OnBoard persists in its contention that Hahn was competing

with OnBoard during his employment, focusing next on 7DS

Associates, LLC, Hahn's current consulting business.    *Hahn Dep.*

*at 9.*    *(Maidens Aff., Exhibit "E").*    OnBoard alleges that Hahn

was soliciting business for 7DS Associates, LLC, at the Arizona

Conference.    *Answer and Verified Counterclaim, ¶17; (Maidens*

*Aff., Exhibit "G").*    Hahn registered the company with the State

19

of New Jersey on May 6, 2009, the day after he was dismissed by OnBoard.  *Id. at 313-314; (Maidens Aff., Exhibit "E")*.  The Arizona Conference was held on March 24-28, 2008, more than a year before 7DS Associates, LLC, was formed.  Hahn registered a domain name, "7DSassociates.com," sometime at the end of April or beginning of May 2009 – again, more than a year after the Arizona Conference.  *Id. at 147.*  Neither the domain name nor the limited liability company provide credible evidence to raise an inference that Hahn was promoting 7DS Associates, LLC as a competing business at the Arizona Conference in March 2008. This claim must therefore be dismissed on summary judgment.

**4.   False expense reports.**

As with OnBoard's other allegations about Hahn's actions at the Arizona Conference, there is no material evidence that Hahn intentionally or willfully – or even accidentally -- submitted false expense reports.  In fact, Bednarsh testified that OnBoard was not even aware of the possibility of falsified expense reports until after Hahn's employment was terminated. *Bednarsh Dep. at 45.*  (Maidens Aff., Exhibit "B").  Consequently, falsified expense reports – even if such existed (which must be assumed on a motion for summary judgment) – could not have formed the basis for Hahn's termination by OnBoard.  The total of OnBoard's alleged loss as a result of these supposedly false reports is the monumental sum of $110.17.  *See Defendant's*

Responses to Plaintiff's Interrogatories No. 17.  (Maidens Aff., Exhibit "L").  As will be discussed at Point IV, *infra*, the loss to OnBoard of $110.17 would not meet the definition of "cause" in Hahn's Employment Agreement and this claim must therefore be dismissed on summary judgment.

**5.  Registering a Website and a domain name using an OnBoard computer and/or an OnBoard account.**

OnBoard has produced no evidence to support its allegation at paragraphs 29-31 of its Answer and Verified Counterclaim that Hahn used an OnBoard computer or the company's account with a Web hosting company to set up the domain, "7DSassociates.com." Even assuming, for the purpose of this motion only, that such was the case, OnBoard has produced no evidence of any material loss it sustained as a result, nor has it produced evidence that Hahn engaged in any actual, personal business transaction using the Website while he was employed by OnBoard.  These actions, even if taken as fact, do not support OnBoard's claims against Hahn, and therefore they must be dismissed on summary judgment.

**6.  Conducting business for 7DS Associates, LLC and notorious-rob.com during working hours.**

As with the preceding claim, discussed at no. 6, this claim is predicated solely on the existence of "notorious-rob.com" and on 7DS Associates, LLC.  For the reasons set forth at points 2 and 3, *supra*, Hahn is entitled to summary judgment dismissing this claim as a basis for any breach of his Employment

Agreement, let alone a breach of duty of good faith and loyalty as alleged by OnBoard.  7DS Associates, LLC, conducted no business prior to Hahn's termination by OnBoard – indeed, it was not even created until the day he was dismissed.  With regard to "notorious-rob.com," it is especially egregious for OnBoard to use this blog as an excuse to deny Hahn his severance when OnBoard itself was fully aware of the blog and, aside from criticizing Hahn for comments he had posted, took no action to remove the blog or to limit plaintiff's blogging activity. OnBoard cannot have it both ways: after allowing Hahn to maintain the blog for more than year, it cannot suddenly decide that the blog was a competing business or an act of disloyalty and thereby deprive Hahn of his severance pay.

**POINT III**

**Because defendant has not produced any evidence that plaintiff used or disseminated any confidential information, the second and third counts of defendant's amended counterclaim must be dismissed.**

OnBoard alleged in its counterclaim that Hahn was inattentive to his duties while employed at the company. *See Answer and Verified Counterclaim, ¶28, (Maidens Aff., Exhibit "G")*. In response to discovery, Hahn produced backup copies of reports, budgets and other materials he had generated during his employment as evidence of his attention to and fulfillment of his responsibilities. At his deposition, he testified that he had not used them or even accessed them until this litigation. *Hahn Dep. at 338-340. (Maidens Aff., Exhibit "E")*. He readily agreed to destroy them. *Hahn Dep. at 331-333. (Maidens Aff., Exhibit "E")*. He testified that

> A. ... [T]his is the first time I'm seeing these since departure from the company, so I guess they were in my backup file somewhere. But, like I said, this is the first time seeing them again.

*Hahn Dep. at 347. (Maidens Aff., Exhibit "E")*. He was questioned in exhaustive detail about virtually every individual document that was produced and gave the same answer: he neither disclosed them nor used them after the termination of his employment with OnBoard. *Hahn Dep. at 348-356. (Maidens Aff., Exhibit "E")*.

The Employment Agreement forbids the disclosure or use of confidential material "in any manner not specifically directed

by OnBoard or in any way which is detrimental to OnBoard … "
*Employment Agreement, (Maidens Aff., Exhibit "C").* OnBoard has
produced no evidence that any of the material was disclosed by
Hahn or was used by Hahn in any way (let alone in any way
detrimental to OnBoard) after the termination of his employment.
Bednarsh admitted at his deposition that, "I haven't received
any specific information that he's disseminated what he's
improperly taken." *Bednarsh Dep. at 94.   (Maidens Aff., Exhibit
"B").*

Without evidence of damage – and given Hahn's readiness to
destroy the material – OnBoard cannot sustain a claim of "cause"
for denying Hahn his severance, and under no circumstances is
OnBoard entitled to the extraordinary remedy of a permanent
injunction.   A court "may not grant a permanent injunction
without a plenary finding, whether as a matter of law or after
trial, that the applicant has succeeded on the merits of its
claim." *Harlem Wizards Entertainment Basketball, Inc. v. NBA
Props., Inc.*, 952 F.Supp. 1084, 1091 (D.N.J.1997).   Absence of
irreparable harm generally defeats an application for permanent
injunctive relief. *See, e.g., Rondeau v. Mosinee Paper Corp.*,
422 U.S. 49, (1975) (although plaintiff prevailed on merits,
absence of traditional showing of irreparable harm rendered
permanent injunction unavailable); *Natural Resources Defense
Council v. Texaco*, 906 F.2d 934, 941 (3d Cir.1990) ("[A]

district court may issue a permanent injunction … only after a showing both of irreparable injury and inadequacy of legal remedies").

Where, as here, the alleged harm is not threatened and will, in fact, be extinguished voluntarily by plaintiff, permanent injunctive relief would be an empty gesture.

## POINT IV

**None of the acts alleged, even if they occurred, meet the definitions of "cause" as provided in the Employment Agreement so as to deprive plaintiff of his severance pay.**

There is no choice-of-law provision in the Employment Agreement; therefore, this Court must determine whether New York or New Jersey law applies in analyzing its terms. "In a diversity action, a Federal court is obliged to apply the substantive law of the state in which the forum is located, including the applicable choice of law principles." *Pepe v. Rival Company*, 85 F. Supp. 2d 349, 380 (D.N.J. 1999), *affirmed* 254 F.3d 1078 (3d Cir. 2001)(citations omitted).

In New Jersey, "the governing law in a contract case is that of the jurisdiction with the most significant relationship and closest contacts with the transaction and the parties." *Pepe, supra, at 380 (citations omitted)*. Based upon the factors enumerated in *Pepe*[2], it is most likely that a New Jersey Court, applying New Jersey choice-of-law rules, would apply New York law. In either event, the outcome would not be different, for like New Jersey, under New York law, the interpretation of a contract "is a matter of law for the court to decide." *Readco,*

---

[2]  They are: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. *Pepe, 85 F. Supp.2d at 380 citing Restatement (Second) of Conflict of Laws § 188.*

*Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996).

The Employment Agreement is specific about the acts that constitute "cause" for the termination of Hahn's employment and the consequent forfeiture of his severance and other post-employment rights, including his Exit Event rights. *See p.6, supra.* None of Hahn's acts as alleged by OnBoard meet the first definition of "cause." No evidence has been produced – not even an allegation – that Hahn committed "fraud, embezzlement, theft or any other material violation of law" during the course of his employment. "Under New York law, a fraud cause of action generally does not arise where the alleged fraud merely relates to a breach of contract." *EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 278 (S.D.N.Y, 2004). OnBoard's counterclaim is limited to causes of action sounding in breach of contract; it has neither alleged nor produced evidence of fraud or criminal activity. Therefore, ¶7.6(i) does not apply.

OnBoard has produced no evidence that Hahn intentionally damaged company assets. No evidence was produced that Hahn ordered any act to be done, or himself took any action, with intent to harm OnBoard. No evidence has been produced that OnBoard clients ceased doing business with the company because of any act ascribed to Hahn or committed by Hahn. The only losses OnBoard cites amount to expenses connected with the

Arizona Conference and a $39.00 purchase Hahn was alleged to have made using a corporate credit card. *See Defendant's answer to plaintiff's interrogatory no. 17, (Maidens Aff., Exhibit "L")*. Without evidence of damage to assets, ¶7.6(ii) does not apply.

OnBoard has produced no evidence that Hahn disclosed confidential information. The mere storage of material on his computer, without more, does not meet the requirement of "intentional disclosure" under ¶7.6(iii).

As set forth at Point II *supra*, OnBoard has produced no evidence that plaintiff engaged in competitive activity while he was employed; therefore, ¶7.6(iv) does not apply.

The last example of "cause" in the Employment Agreement is "willful conduct … that is demonstrably injurious," ¶7.6(v). OnBoard contends this definition of "cause" was met as a result of an incident that occurred on April 30, 2009, when a client survey was mistakenly emailed to a large list of clients in OnBoard's database. *See Siden emails, (Maidens Aff., Exhibit "K")*. The survey was not supposed to have been sent to many of the recipients, and Hahn was not in the office at the time it was sent. *Hahn Dep. at 51 (Maidens Aff., Exhibit "E"); Bednarsh Dep. at 53-54 (Maidens Aff., Exhibit "B"); Siden Dep. at 9 (Maidens Aff., Exhibit "D")*. The incident occurred on a Thursday, and Siden and Bednarsh were unable to reach Hahn over

the weekend to find out why the survey had been sent.   *Ibid.*
Siden noted this incident in his May 5 memorandum, *see Maidens
Aff., Exhibit "I"*; however, both he and Bednarsh admitted that
the company experienced no loss of business as a result.   *Siden
Dep. at 40-41 (Maidens Aff., Exhibit "D"); Bednarsh Dep. at 96-
97 (Maidens Aff., Exhibit "B").*   Bednarsh further admitted that
there was no evidence that the email had been deliberately sent,
let alone deliberately sent to the wrong people.   *Bednarsh Dep.
at 58 (Maidens Aff., Exhibit "B").*

Without evidence of "demonstrable" and "material" injury
resulting from the emailed survey and without evidence that it
was a deliberate act on Hahn's part calculated to damage
OnBoard, defendant has not met its evidentiary burden on this
aspect of "cause" such as would justify denying Hahn his
severance pay.

The last paragraph of ¶7.6 of the Employment Agreement
provides that: "Failure to meet performance standards or
objectives, by itself, does not constitute 'Cause'."   *(Maidens
Aff., Exhibit "C").*   Even if failure were grounds for "cause,"
OnBoard has produced no evidence that Hahn failed to meet
performance standards; in fact, his quarterly review for the
fourth quarter of 2008 (the only review produced by OnBoard)
indicates a better-than-average rating of 3.1 out of a potential
of 5.0.   *See* "2008 Quarterly Review for Rob Hahn," ("Review")

(*Maidens Aff., Exhibit "R"*).  In the Review, Siden had written:
"He continues to be a great asset to our company and while I can
be critacal [sic] at times, he seems to really understand where
I coming [sic] from- that is a maturity that I appriciate [sic]
very much."

     The Employment Agreement sets a high bar for OnBoard to
clear in order to declare that "cause" exists for depriving Hahn
of his post-termination rights.  OnBoard has failed to produce
any evidence creating an issue for trial on whether Hahn is
entitled to his severance.  "Summary judgment is not a
disfavored procedural shortcut, but rather an essential thread
in the fabric of the Federal Rules that eliminates unfounded
claims without recourse to a costly and lengthy trial."
*Illingworth v. Nestle U.S.A., Inc.*, 926 F. Supp. 482, 487
(D.N.J. 1996).  "No issue for trial exists unless the nonmoving
party can demonstrate sufficient evidence favoring the nonmoving
party such that a reasonable jury could return a verdict in that
party's favor."  *Ibid.*  "When no rational jury could find in
favor of the nonmoving party because the evidence to support its
case is so slight, there is no genuine issue of material fact
and a grant of summary judgment is proper."  *Gallo v. Prudential
Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.
1994).  OnBoard's case rests on a collection of beliefs,
inferences, hearsay and accusations.  The material evidence to

encase this collection in reality is singularly lacking.

## Point V

### Plaintiff is entitled to summary judgment awarding him three months severance pay.

OnBoard has no evidence that Hahn resigned, only the self-serving assertions of Bednarsh and Siden as to what Hahn supposedly said at their May 5 meeting. *Bednarsh Dep. at 60 (Maidens Aff., Exhibit "B"); Siden Dep. at 51 (Maidens Aff. Exhibit "D").* Their accounts are not only hearsay but also contradict logic: there was no motive for Hahn to resign, since by doing so he would forfeit his severance pay, not to mention the Exit Event rights he had bargained for. In contrast, there is a strong motive for Bednarsh and Siden to concoct a case for his resignation — OnBoard will be relieved of its duty to pay Hahn $30,000.00 in severance and will be relieve of its future obligation to Hahn upon the occurrence of an Exit Event.

Hahn negotiated the terms of the Employment Agreement to protect himself as an at-will employee from arbitrary deprivation of his termination package. Hahn does not dispute OnBoard's right to terminate his employment; however, OnBoard did not have the right to engineer the forfeiture of Hahn's severance. As the District Court held in *Kemelhor v. Penthouse International, Ltd.*, 689 F. Supp. 205 (S.D.N.Y. 1988):

> An employer has the right to terminate the employment
> contract pursuant to a provision therein.  …  However,
> an employer attempting to utilize a termination clause
> based on the employer's discretion must not act in a

32

<u>surreptitious or unreasonable fashion. … Moreover,</u>
<u>an employer seeking to discharge an employee by using</u>
<u>a clause in the contract vesting the employer with</u>
<u>discretion must act in good faith.</u> … In sum, the law
requires the employer to have some articulable reason
for terminating the employee under such a provision in
the contract.

*689 F. Supp. at 213-214* (citations omitted; emphasis added).

OnBoard knew that anything it could criticize Hahn for –
legitimately or not – would not rise to the level of "cause" as
defined in the Employment Agreement.   OnBoard nevertheless is
attempting to have it both ways: to rid itself of both Hahn and
its obligation to him for his post-employment entitlement.

33

## Conclusion

For the foregoing reasons, plaintiff respectfully requests that summary judgment be granted to him dismissing defendant's amended counterclaim with prejudice and awarding him summary judgment in the amount of $30,000.00, representing three months salary, as his severance pay.

Respectfully submitted,

MELINDA B. MAIDENS
For the Firm

Dated:   September 21, 2010

34