**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT HAHN, | ) Case No. 2:09-cv-03639-DRD-MAS |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **AMENDED PROPOSED** |
| | ) **FINDINGS OF FACT** |
| ONBOARD, LLC, | ) **AND CONCLUSIONS OF LAW** |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff, Robert Hahn, respectfully submits the following amended proposed findings of fact and conclusions of law to be made by the Court in this bench trial.

<u>**PROPOSED FINDINGS OF FACT**</u>

**I.**
<u>**On Plaintiff's Claim**</u>

1.   Plaintiff has brought a claim against defendant for breach of contract arising from defendant's failure and refusal to pay plaintiff his severance in accordance with the terms of a written employment agreement (the "Employment Agreement") between them.

2.    Plaintiff, Robert Hahn, is a graduate of Yale University and holds a law degree from New York University.

3.    Plaintiff was employed by defendant as Vice President of Marketing commencing in or about September 2007 until May 5, 2009.

4.    The terms and conditions of plaintiff's employment were set forth in the Employment Agreement, which both parties executed on or about September 19, 2007.

5.    Plaintiff personally negotiated the terms of the Employment Agreement with Jonathan Bednarsh, President and Chief Operating Officer of defendant.

6.    Jonathan Bednarsh and his business partner, Marc Siden, who is the Chief Executive Officer of defendant, founded defendant in or about 1995.

7.    Under the terms of the Employment Agreement, plaintiff was an "at-will" employee, meaning that defendant could fire him at any time and without cause.

8.    The Employment Agreement provides that plaintiff would be entitled to specific payments in the event of his termination, namely: (a) severance pay in an amount equal to three months of his salary at the time of termination; and (b) the retention of certain rights, which are defined in the Employment Agreement as "Exit Event rights," and which give

plaintiff a share of the proceeds in the event defendant is sold or otherwise undergoes a change of ownership.

9.   The Employment Agreement provided that plaintiff would forfeit his severance and his Exit Event rights under only two circumstances: (a) his voluntary resignation; or (b) his termination for "cause," as that term is defined in the Employment Agreement.

10.   "Cause" is defined at Paragraph ¶7.6 of the Employment Agreement as:

> (i)   an intentional act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of your employment with company;
>
> (ii)  intentional damage to companies [sic] assets;
>
> (iii) intentional disclosure of company's confidential information contrary to companies [sic] policies;
>
> (iv)  intentional engagement in any competitive activity which would constitute a breach of your duty of loyalty or of your obligations under this agreement;
>
> (v)   willful conduct by you that is demonstrably and materially injurious to company, monetarily or otherwise.
>
> For purposes of this paragraph, and [sic] act, or a failure to act, shall not be deemed willful or intentional, as those terms are defined herein, unless it is done, or omitted to be done, by you in bad faith or without a reasonable belief that your action or omission was in the best interest of company.   Failure to meet performance

3

standards or objectives, by itself, does not constitute "Cause".

11.  During the time plaintiff was employed by defendant, he received an overall rating of 3.1 out of a possible 5.0 rating on his performance review for the fourth quarter of 2008, which is the only written evaluation prepared and placed in his file.

12.  On May 5, 2009, at approximately 1:00 p.m., plaintiff met with Bednarsh and Siden in Siden's office.  At that meeting, the following occurred:

   a.  Siden criticized plaintiff's work performance, using the phrases "willful misconduct," "insubordination" and "competing with OnBoard," which latter phrase referred to plaintiff's maintaining a Weblog, also called a "blog."

   b.  Siden further criticized plaintiff in connection with a client satisfaction survey that had been mistakenly emailed on April 29 or April 30, 2009. Plaintiff was home ill on Friday, May 1, and had not responded to emails to him that day.

   c.  Siden demanded that plaintiff resign or be terminated for cause.

4

d.   Siden gave plaintiff a blank piece of paper and demanded that plaintiff write his resignation on the paper.

e.   Plaintiff did not write or sign a resignation letter or statement.

f.   Plaintiff did not verbally declare he was resigning.

g.   Siden, Bednarsh and plaintiff discussed how to present the fact of Hahn's departure from OnBoard to the rest of the employees.

h.   Plaintiff requested time to speak to his wife and counsel before any decision was to be made.

i.   Bednarsh and Siden granted plaintiff's request and all three agreed that they would meet the next day to discuss matters relating to Hahn's departure.

13.   Plaintiff then left Siden's office and retrieved his bag from his desk. The bag contained a laptop issued by defendant.

14.   Plaintiff did not collect any of his personal effects from his desk, such as photographs of his children.

15.   Plaintiff did not speak to any colleagues about what had transpired in the meeting with Bednarsh and Siden.

16.  At 10:56 a.m., just prior to leaving the building, plaintiff sent an email to his staff stating that he had an emergency at home and had to leave. *Defendant's Exhibit 18.*

17.  After retrieving his bag from his desk, plaintiff left the building.

18.  After leaving the building, plaintiff telephoned his wife and told her he had been fired.  He then telephoned a friend who was an attorney and told him that he had been fired.

19.  Plaintiff did not send an email to the company or to the staff of the Marketing Department announcing his resignation either on May 5, 2009, or at any time thereafter.

20.  Plaintiff made no mention to anyone at the company, including his colleagues in the Marketing Department, of his having resigned on May 5.

21.  At 3:32 a.m. on the morning of May 6, plaintiff sent an email to the staff of the Marketing Department advising that he was not coming into work that day.  *Defendant's Exhibit* 20. At 3:34 a.m., plaintiff sent an email to Siden, which he had previously sent to Bednarsh, requesting that the meeting they had planned for that day be postponed to the next day because he had come home late the evening before and had not had time to speak to his wife and his attorney.  *Defendant's Exhibit 19.*

22.  Bednarsh sent plaintiff an email at 10:03 a.m. May 6 stating, among other things, "As you said yesterday, you have

been thinking about this for some time …." *Defendant's Exhibit 19*.

23.  Plaintiff inferred from that email that Bednarsh was attempting to portray plaintiff's departure as a voluntary resignation and in response sent an email that same day which reads in relevant part as follows:

> … I was terminated on Tuesday.  Although you and Marc asked for my resignation multiple times, you did so after the termination was a *fait accompli* and your requests for a 'resignation' were an attempt to create artificial window-dressing.

*Plaintiff's Exhibit 9*.

24.  Bednarsh did not respond to plaintiff's email.

25.  On May 6, Bednarsh instructed Ali Haider, defendant's director of information technology, to terminate plaintiff's email account access, with the notation, "this can not [sic] wait till [sic] morning." *Defendant's Exhibit 54*.

26.  At 11:13 a.m. on May 7, Bednarsh sent a company-wide email stating, among other things, that: "…Rob Hahn has resigned from the company effective this past Tuesday.  He is no longer employed by the company." *Defendant's Exhibit 54 (hereinafter, "May 7 email")*.

27.  Bednarsh did not request plaintiff's permission to send the May 7 email.

7

28. Bednarsh did not notify plaintiff about the May 7 email, either prior to or subsequent to sending it.

29. Plaintiff learned that Bednarsh had sent the May 7 email only after a colleague telephoned him that afternoon.

30. On or about May 6, Bednarsh instructed Cheryl Crouse, who was at that time defendant's director of human resources, to prepare an Employee Separation Record. *Defendant's Exhibit 55.*

31. The Employee Separation Record bears check marks at the boxes labeled "Voluntary" and "Personal Reasons" where the reasons for termination are listed.

32. Crouse filled out the boxes on the Employee Separation Record at Bednarsh's instruction and did not contact plaintiff for instructions to fill out the form.

33. Pursuant to defendant's usual policy, when an employee resigns, Crouse contacts that employee and sets up a meeting to review separation procedures.

34. Crouse did not contact plaintiff on May 5, 2009, or at any time thereafter and did not set up a meeting with him to review separation procedures.

35. Plaintiff, a married man with two young children, had no motive to resign, because by doing so he would forfeit his severance package that he had negotiated as a condition to his acceptance of at-will employment status with defendant.

36. Defendant had motive to portray plaintiff's departure as a resignation because it would relieve defendant of the obligation to provide plaintiff with his severance package.

37. The testimony of Siden that he was "surprised" by plaintiff's alleged declaration on May 5 that he was resigning is not credible in light of the following facts, which were undisputed during testimony:

      a. On April 28, one week before the May 5 meeting, Siden stated that plaintiff had offered to resign and that Siden had refused the offer; and

      b. Siden is an experienced business executive, a co-founder of defendant, and therefore would be expected to anticipate the possibility that plaintiff would resign if plaintiff had previously made such an offer.

38. Defendant's version of the events on May 5 is not credible in light of the following facts established via undisputed testimony:

      a. Plaintiff has a law degree and negotiated his Employment Agreement with special attention to provisions affording him a severance package as long as he did not resign or was not terminated for cause;

      b. Plaintiff signed no statement of resignation; and

    c.   Plaintiff's actions after leaving Siden's office are not consistent with the actions of an employee who voluntarily left his employment but are consistent with the actions of an employee who was terminated without prior notice.

39.  Plaintiff's actions and movements immediately subsequent to his leaving Siden's office on the morning of May 5 consisted of the following:

    a.   Plaintiff did not say "goodbye" to any colleagues, which would be expected if plaintiff's departure were voluntarily, as in the case of a resignation;

    b.   Plaintiff went directly to his desk but did not collect all his personal possessions, such as photographs of his children;

    c.   Plaintiff did not tell anyone why he was leaving the office early but instead made the excuse of a family emergency.  Since it is unlikely that an employee who is terminated would announce that embarrassing fact to colleagues, plaintiff's excuse for leaving early is more indicative of an involuntary, unanticipated separation from his employment;

> d.   Plaintiff left the building and then telephoned his wife and told her he had been fired; and
>
> e.   Plaintiff called an attorney after speaking to his wife.

40.   Defendant's actions on May 6 and 7 are consistent with a plan to force the issue and make it appear that plaintiff had resigned on the basis of the following facts:

> a.   Bednarsh sent an email to plaintiff stating that plaintiff was "planning this," but there was no prior statement or email by plaintiff referring to any such plan;
>
> b.   After plaintiff sent a responding email stating that he had been terminated, Bednarsh sent a company-wide announcement of plaintiff's resignation, without notifying plaintiff in advance, without confirming with plaintiff and without copying plaintiff on the email;
>
> c.   Bednarsh instructed defendant's Human Resources Manager to fill out the Employee Separation Record and to indicate that plaintiff's separation was voluntary and for personal reasons, when defendant's usual procedure was for the Human Resources Manager to speak personally

11

to an employee who had resigned and to consult with him about filling out the form.

## II.
## On Defendant's Counterclaim

1. Defendant has asserted a counterclaim against plaintiff alleging the following causes of action: (a) breach of duty of good faith and loyalty; (b) breach of contract and (c) permanent injunction.

2. Defendant's claim of breach of duty of good faith and loyalty rests on the following allegations:

    a. While employed by defendant, plaintiff allegedly solicited defendant's clients to leave defendant and become clients of a company allegedly owned by plaintiff at the time he was employed;

    b. Plaintiff allegedly diverted defendant's assets and business opportunities by means of plaintiff's blog and by unspecified acts at a business conference in Scottsdale, Arizona (the "Scottsdale Conference"), which plaintiff and other employees of defendant attended from March 24-28, 2009;

    c.    Plaintiff allegedly advertised his own business at the Scottsdale Conference rather than defendant's business;

    d.    Plaintiff allegedly submitted false expense reports after the Scottsdale Conference;

    e.    Plaintiff allegedly registered a Website, "7dsassociates.com" using defendant's computer and defendant's account with a Web hosting company;

    f.    Plaintiff allegedly registered a domain name using defendant's computer and defendant's Internet account;

    g.    Plaintiff allegedly conducted personal business during office hours; and

    h.    Plaintiff allegedly used defendant's resources to conduct personal business, including blogging.

3.    Defendant further alleges that plaintiff was planning to resign his position with defendant and alleges certain acts as a basis for this claim: (a) a remark to Stacey Ret, plaintiff's assistant in the Marketing Department, on April 27, 2009, that she should prepare to take over the department; (b) plaintiff allegedly offered to resign in a conversation with Siden on April 28, 2009; and (c) plaintiff allegedly formed a competing company, 7DS Associates, LLC, during his employment.

## A.    Scottsdale Conference

1.    Plaintiff and the following employees of defendant: Stacey Ret, Ira Monko and Michael Demetriou, among other employees, attended an industry conference sponsored by the Leading Real Estate Companies of the World in Scottsdale, Arizona, from March 24-28, 2009 (the "Scottsdale Conference").

2.    Plaintiff gave a sales pitch for OnBoard to Matthew Dollinger, vice president of strategic development at World Properties, LLC, also known as "@properties."

3.    Plaintiff helped set up defendant's display booth, held a video focus group and participated in sales meetings.

4.    Plaintiff distributed blog cards to an unknown number of individuals at the Scottsdale Conference.  *Defendant's Exhibit 25*.

5.    The blog cards contain plaintiff's name, the URL "notorious-rob.com," plaintiff's personal email address, a telephone number and plaintiff's Twitter "tag."  *Defendant's Exhibit 25*.

6.    Plaintiff distributed his business card from defendant along with his blog card.

7.    Plaintiff's blog card does not include the name of any business entity and is not a business card in the ordinary and usual understanding of the term "business card."

8. Plaintiff was recognized by Dollinger at the Scottsdale Conference as a result of plaintiff's blog.

9. Plaintiff's motive in distributing his blog card was to introduce potential clients to defendant by means of plaintiff's blog.

10. Contact via social media, including blogs, email and Twitter, constituted one of plaintiff's approaches to marketing defendant.

11. Defendant not only knew of plaintiff's use of social media, including his personal blog, to promote the defendant's company, its brand and its products, but also approved of such a strategy as a routine part of overall marketing.

12. Defendant did not advise plaintiff in advance of any quotas or goals with regard to business solicitations or business leads to be produced at the Scottsdale Conference.

13. No evidence was produced during the trial that plaintiff pitched any business of his own in competition with defendant at the Scottsdale Conference.

14. No evidence was produced during the trial that plaintiff owned any separate, personal business at the time of the Scottsdale Conference.

15. Plaintiff was not advised of any dissatisfaction on defendant's part with his performance at the Scottsdale conference at any time prior to May 5, 2009.

16.  Defendant offered the testimony of Ira Monko, a former employee of defendant, who testified as follows:

> a.  He saw plaintiff at defendant's display booth on only one occasion and plaintiff did not attend a session that Monko had either organized or attended.
>
> b.  He saw plaintiff talking to various individuals during the conference.  He admitted that he could not hear what plaintiff was saying to them.
>
> c.  He did not accompany plaintiff throughout the conference and saw him only "about 40%" of the time.

17.  Dollinger testified that plaintiff pitched defendant's products to him and did not pitch any competing product.

18.  No evidence was produced of specific expenses allegedly falsified by plaintiff.

**B.  Plaintiff's blog, "notorious-rob.com"**

1.  Plaintiff maintains a Weblog ("blog") known as "notorious-rob.com" by means of which plaintiff posts writings and comments of his views about the real estate industry, among other topics.

2.  Bednarsh and Siden were aware that plaintiff maintained the blog during his employment.

16

3. During the time plaintiff was employed by defendant, he mentioned defendant favorably on his blog at times.

4. Plaintiff did not advertise or promote any other company on his blog during the time he was employed by defendant.

5. During plaintiff's employment by defendant, plaintiff used his blog to convey his opinions and thoughts about the real estate industry and did not use his blog to conduct a competing business with defendant.

6. During plaintiff's employment by defendant, plaintiff posted critical comments about Coldwell Banker, a client of defendant, on his blog on two occasions.

7. Coldwell Banker complained to defendant about the comments.

8. Bednarsh and Siden requested plaintiff to remove the posts, which he did.

9. Coldwell Banker did not terminate its relationship with defendant because of plaintiff's comments on his blog, nor did Coldwell Banker take any other action detrimental to the defendant, such as demanding discounts or public apologies.

10. On May 1, 2009, plaintiff migrated the blog to a different Web hosting platform.

11. Migrating the blog involves working at a computer, which can be done at home.

12. No evidence was produced of any cost incurred by defendant resulting from any alleged use by plaintiff of defendant's computer or other resources to migrate plaintiff's blog.

## C.   Solicitation of Defendant's Clients.

1.   To support its allegation that plaintiff solicited defendant's clients for plaintiff's personal gain, defendant offered evidence of only one example, that of Metropolitan Regional Information Systems, Inc. ("MRIS").

2.   MRIS was a client of defendant during the time of plaintiff's employment by defendant.

3.   No evidence was introduced that plaintiff had any contact with any representative of MRIS during the course of his employment by defendant, whether in connection with plaintiff's duties or otherwise.

4.   In a letter dated December 15, 2009, from Danielle Blanchard to Siden, MRIS notified defendant that it was terminating the agreement between the two companies. *Plaintiff's Exhibit 4.*

5.   Plaintiff rendered consulting services to MRIS during the latter part of 2009 and was employed by MRIS from approximately January 2010 to May 2010.

18

6.    Defendant's claim that plaintiff solicited MRIS at the Scottsdale Conference in March 2009 is not credible in light of the fact, established in the undisputed testimony of David Charron, the president of MRIS, that MRIS did not send representatives to that conference.

7. Defendant's claim that plaintiff personally solicited business from Charron for plaintiff and not for defendant at the Scottsdale Conference is not credible in light of the fact, established in Charron's undisputed testimony, that he did not attend that conference.

8.    Defendant's claim that plaintiff induced or caused MRIS to terminate its business relationship with defendant while plaintiff was employed by defendant is not supported by a preponderance of the credible evidence.  This conclusion is based upon the following facts established in undisputed testimony:

> a.    Plaintiff was not in contact with MRIS during the time he was employed by defendant;
>
> b.    The first contact between plaintiff and MRIS occurred in June 2009, after plaintiff was no longer employed by defendant;
>
> c.    The contact with plaintiff was initiated by Charron and not by plaintiff; and

      d.    Charron was not aware of plaintiff's employment by defendant prior to his first meeting with plaintiff.

9.    Plaintiff's Employment Agreement with defendant contained no post-employment restrictive covenant or non-compete provisions.

10.  No evidence was produced of the monetary value of defendant's contract with MRIS or of any revenue actually lost by defendant as a result of the termination of the contract with MRIS.

**D.    Formation of 7DS Associates, LLC.**

1.    Plaintiff created the term "7DS" for use on his blog "notorious-rob.com" to describe his marketing methods commencing sometime in 2008.

2.    Plaintiff reserved the domain name "7dsassociates.com" on or about April 27, 2009.

3.    A domain name is not a corporate entity; it is an address on the World Wide Web for people to find Websites.

4.    No evidence was produced of any cost incurred by defendant resulting from any alleged use by plaintiff of defendant's computer, Web hosting account or other resources to register the domain name.

5.   Plaintiff registered 7DS Associates, LLC ("7DS") as a limited liability company in the State of New Jersey on May 6, 2009.  *Plaintiff's Exhibit 7.*

6.   Plaintiff's purpose in registering 7DS was to make a living since he was no longer employed by defendant as of May 5, 2009.

7.   Plaintiff did not have his own business prior to May 6, 2009.

**E.   Meeting with Siden on April 28, 2009**

1.   Plaintiff met with Siden on April 28, 2009 for a regularly scheduled status meeting.

2.   At the meeting, plaintiff brought up the topic of taking part-time employment status and renegotiating his Employment Agreement accordingly.

3.   Plaintiff broached the topic because he was aware that defendant was experiencing financial difficulties at the time. A major product under development, which had been intensely marketed during the previous months, had substantial problems delaying its introduction.  Plaintiff had been instructed to lay off two employees in the Marketing Department to save costs.

4.   At the April 28 meeting, Siden told plaintiff that he wanted plaintiff to remain on a full-time basis.

5.   Defendant closed its Florida office and laid off its employees there subsequent to firing plaintiff.

**F.   The Emailing of the Client Survey.**

1.   At the May 5 meeting, Bednarsh and Siden cited the erroneous emailing of a client satisfaction survey on April 29 or April 30, 2009, in criticizing plaintiff's performance.

2.   Sometime on April 29 or 30, 2009, client satisfaction surveys were emailed to many clients in defendant's database. *Defendant's Exhibit 12.*

3.   The survey was not supposed to have been emailed to some of the recipients.

4.   The identity of the person or persons who caused the survey to be emailed is unknown.

5.   Plaintiff was not at the office when the surveys were emailed.

6.   Plaintiff sent an email to defendant on Friday, May 1, advising that he was home ill and would not come into work. *Defendant's Exhibit 13.*

7.   The following emails, marked in evidence as part of Defendant's Exhibit 12, were sent by defendant to plaintiff regarding the emailed survey:

> a.   From Peter Goldey, April 30, 7:47 p.m., asking plaintiff to "ask whomever organized this blast to review how it was done ….";

22

     b.    From Siden on May 1 at 1:23 p.m., stating, in part, "When you are up and about we need to understand why this happened"; and

     c.    From Siden on May 1 at 3:46 p.m., stating, "I really need you to chime in on the client survey issue.  It is creating a lot of confusion right now.  Please reach out to Peter ASAP."

8.   Plaintiff did not send emails in response to those emails.

9.   There is no evidence that any more emails were sent to plaintiff about the emailed survey from May 1 through May 3.

10.   Neither Siden nor Bednarsh telephoned plaintiff on Friday, May 1 or over the weekend to further discuss the emails or to inquire why they did not receive a response to the emails sent on April 30 and May 1.

11.   Plaintiff returned to work on Monday, May 4.  At 11:37 a.m., he received a text message from Siden, saying, "Jon and I would like to chat with you ASAP." *Defendant's Exhibit 11.*

12.   In response to the text message, plaintiff sent a message saying he was at lunch with an employee of defendant and would get back to Siden as soon as he could.

13.   Siden sent no response to plaintiff's text message.

14.   Plaintiff appeared at Siden's office at approximately 1:00 p.m.  Siden was on the telephone at the time and told plaintiff that Bednarsh was unavailable and he would contact plaintiff when Bednarsh could meet.

15.  Siden did not contact plaintiff the rest of that day or evening.

16.  Defendant did not suffer a loss of business as a result of the emailed survey.

17.  No evidence was produced that plaintiff was motivated by bad faith in not responding to the emails on April 30 and May 1.

## G.  Absences

1.  Defendant alleges that plaintiff's absences and lateness during March and April 2009 is evidence of plaintiff's intention to resign.

2.  Defendant was aware of plaintiff's pattern of absences and of lateness prior to May 2009.

3.  In defendant's 2008 Quarterly Review of plaintiff, Siden wrote, in part, "His tardiness has improved very slightly." *Plaintiff's Exhibit 8*.

4.  Plaintiff's absences and/or lateness did not result in his missing any work deadlines.

5.  Plaintiff's absences and/or lateness did not result in the inability of the Marketing Department to function.

6.  Absence and lateness are not listed among the definitions of "cause" in the Employment Agreement.

24

## H.   Confidential Material

1.   Defendant permitted or allowed plaintiff to work from his home and was aware that plaintiff prepared reports and other documents using material he either generated or obtained in the course of his employment.

2.   Plaintiff had stored certain documents and files containing defendant's company material on his home computer, which he used during his employment for the purpose of his employment duties.

3.   Plaintiff did not disseminate the material to any person or entity outside defendant during the course of his employment.

4.   After the termination of his employment, the material remained on plaintiff's computer.

5.   After the termination of his employment, plaintiff did not access or use the material, did not disseminate it to any other person and did not make use of it for his own business or personal purposes.

6.   On May 20, 2011, plaintiff brought his hard drive to a computer store and had the material on it erased.   *Plaintiff's Exhibit 10.*

7.   There is no evidence that the material was disseminated to any third party.

## PROPOSED CONCLUSIONS OF LAW

### I.
### General

1.   In a case brought in Federal Court exercising diversity jurisdiction under 28 U.S.C. §1332, the standard for the burden of proof on elements of a claim or defense is determined by recourse to state law.   *F.R.E. 302; Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

2.   In civil cases in New York, as in New Jersey, the party asserting a claim bears the burden to sustain that claim by a "preponderance of the evidence."   *V.S. International, S.A., v. Boyden World Corp.*, 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994); *Liberty Mutual Ins. Co. v. Land*, 186 N.J. 163, 169 (2006).

### II.
### On Plaintiff's Claim

1.   The preponderance of credible evidence supports the conclusion that plaintiff was terminated by defendant on May 5, 2009, and did not leave his job voluntarily.

2.   The acts that defendant ascribes to plaintiff do not meet the definition of "cause" in the Employment Agreement.

> a.   Defendant alleged no fraud, embezzlement, theft or material violation of law and did not produce any evidence, let alone a preponderance of

evidence, of same. *Employment Agreement, ¶7.6(i)*.

b.   Defendant did not meet its evidentiary burden to establish that any act of plaintiff was done with intent to damage defendant's assets or in fact resulted in damage to defendant's assets. *Employment Agreement, ¶7.6(ii)*.

c.   The preponderance of the evidence produced in this action does not support an inference that plaintiff intentionally disclosed defendant's confidential information. *Employment Agreement, ¶7.6(iii)*.

d.   The preponderance of the evidence produced in this action does not support an inference that plaintiff engaged in competitive activity while employed by defendant. *Employment Agreement, ¶7.6(iv)*.

e.   The preponderance of the evidence produced in this action does not support an inference that plaintiff's conduct was willful or demonstrably and materially injurious to defendant. *Employment Agreement, ¶7.6(v)*.

3.   Under the terms of the Employment Agreement, plaintiff is entitled to severance pay in the amount of $30,000.00 and a

finding of fact that his employment was terminated by defendant without cause.

### III.
### Defendant's Counterclaim

1.   The Employment Agreement was drafted in New York and its performance was largely within New York State and therefore, New Jersey courts will apply New York law.   *Kelman v. Foot Locker*, no. 05-CV-2069, 2006 WL 333506, at *6 (D.N.J., Nov. 16, 2006).

2.   An employee owes a duty of good faith and loyalty to his employer.   *Krause v. Gelman*, 580 N.Y.S.2d 750 (1st Dept. 1992).

3.   An employee may not use his employer's time, facilities or resources to incorporate a business prior to leaving his employment.   *Maritime Fish Products, Inc. v. Christensen*, 474 N.Y.S.2d 281 (1st Dept. 1984)*; Chemfab Corp. v. Integrated Liner Tech., Inc.*, 693 N.Y.S.2d 752 (3d Dept. 1999).

4.   An employee may not solicit his employer's clients. *A&L Scientific Corp. v. Latmore*, 696 N.Y.S.2d 495 (2nd Dept. 1999); *Hayes v. Case-Hoyt Corp.*, 692 N.Y.S.2d 292 (4th Dept. 1999).

5.   With respect to proving damages for breach of contract, "it is well established under New York law[] that a

plaintiff must prove the existence of damages with certainty in order to recover for breach of contract." *V.S. International, S.A., v. Boyden World Corp.*, 862 F. Supp. 1188, 1197 (S.D.N.Y. 1994).

6. The credible evidence introduced at trial in this action does not establish by a preponderance that plaintiff failed to adequately represent and/or promote defendant at the Scottsdale Conference.

    a. Defendant produced no evidence that plaintiff attempted to pitch a competing company or to pitch himself or any company of his in competition with defendant.

    b. Defendant produced no evidence that plaintiff's blog cards were understood by anyone at the Scottsdale Conference to represent a personal business of plaintiff that was competing with defendant.

    c. Defendant produced no evidence that plaintiff was given any quota or goal to meet and which he failed to meet.

    d. Defendant produced no evidence of specific items in the expense reports submitted by plaintiff for reimbursement that were falsified or that did not represent reimbursable business expenses.

7.   Defendant is not entitled to reimbursement by plaintiff of his salary or expenses during the time plaintiff attended the Scottsdale Conference.

8.   The evidence is undisputed that plaintiff did not use defendant's time, facilities or resources to register 7DS Associates, LLC.   Plaintiff himself registered 7DS Associates, LLC, on May 6, 2009, the day after his employment with defendant ended and therefore, plaintiff did not breach his duty as that duty is described in *Maritime Fish Products* and *Chemfab Corp, supra.*

9.   Defendant has not established by a preponderance of the evidence that plaintiff was planning to resign from his employment.

> a.   Although plaintiff's registration of a domain name, "7dsassociates.com" on April 27, 2009, may raise an inference of preparation to establish a business, plaintiff explained that the circumstances were such that he was willing to consider taking part-time status as a means of assisting defendant during a difficult financial period.   The registration of the domain name is therefore consistent with plaintiff's testimony that he was aware of the possibility of having to

seek additional income if he was placed on part-time status.

b.   Testimony regarding plaintiff's conversation with Ret about her taking over the department occurred in the context of plaintiff's awareness of defendant's financial problems at the time and the potential of layoffs.

c.   Testimony regarding plaintiff's "dissociation" from his work, as illustrated by absence and lateness, was explained by plaintiff as his feeling of demoralization because of defendant's financial difficulty.

d.   The evidence does not suffice to support a conclusion by a preponderance that plaintiff's state of mind at the end of April and beginning of May 2009 was such that he intended to resign from his employment.

10.   As plaintiff had no contact with MRIS during his employment by defendant and was no longer employed by defendant after May 5, 2009, the preponderance of credible evidence does not support defendant's claim of disloyalty in regard to the decision of MRIS to terminate its contract with defendant.

11.   As there is no post-employment restrictive covenant in plaintiff's Employment Agreement, plaintiff did not breach his

Employment Agreement or his duty of loyalty to defendant in providing services to MRIS after the termination of his employment by defendant.

12. The preponderance of credible evidence does not support defendant's claim that plaintiff, while employed by defendant, solicited any client of defendant for plaintiff's personal gain in violation of his duty of loyalty.

13. The preponderance of credible evidence does not support defendant's claim that plaintiff's blog represented a business competing with defendant or was understood by any third party to be a competitor of defendant, which would constitute a violation of plaintiff's duty of loyalty.

14. The preponderance of credible evidence does not support defendant's claim that plaintiff conducted personal business during working hours, which would constitute a violation of plaintiff's duty of loyalty.

15. The preponderance of credible evidence does not support defendant's claim that plaintiff acted in bad faith or breached his duty of loyalty to his employer.

16. The preponderance of credible evidence does not establish that plaintiff committed waste of defendant's corporate assets.

17.  The  preponderance  of  credible  evidence  does  not support  defendant's  claim  that  plaintiff  committed  theft  or diverted corporate assets and/or opportunities from defendant.

18.  The  preponderance  of  credible  evidence  does  not establish that plaintiff misused or misappropriated defendant's corporate  assets,  expertise  or  and  confidential  information  for his personal and separate business use.

19.  The  preponderance  of  credible  evidence  does  not support the claim that defendant incurred damages as a result of any act or omission of plaintiff.

20.  The  preponderance  of  credible  evidence  does  not support  the  claim  that  defendant  incurred  any  loss  as  a consequence of plaintiff's retention of company material on his computer.

21.  Defendant has not proved the existence of damages with certainty  on  the  following  claims:  (a)  misuse  or misappropriation  of  company  resources  to  register  the  domain name,  "7dsassociates.com";  (b)  the  migration  of  plaintiff's  blog to  another  Web  hosting  platform;  (c)  plaintiff's  retention  of company  material  on  his  computer;  or  (d)  lost  revenue  arising from  the  termination  of  the  MRIS  contract,  for  which  plaintiff in any event was not responsible.

33

22. Defendant is not entitled to recovery of damages in any amount from plaintiff.

JEFFER, HOPKINSON & VOGEL
Attorneys for Plaintiff,
Robert Hahn

Dated:   June 23, 2011          By: _____
MELINDA B. MAIDENS
For the Firm

34