**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT HAHN, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 2:09-cv-03639 (MAS) |
| | ) |
| vs. | ) **DEFENDANT'S AMENDED** |
| | ) **PROPOSED FINDINGS OF FACT** |
| ONBOARD, LLC, | ) **AND CONCLUSIONS OF LAW** |
| | ) |
| Defendant. | ) |
| | ) |

Defendant OnBoard, LLC ("OnBoard" or "Defendant") by its attorneys, Law

Offices of David C. Berg, submits the following amended proposed findings of fact and

conclusions of law in accordance with the Court's June 22, 2011 Order:

I.    **Findings of Fact**

    A.    **Background**

    1.    OnBoard is a limited liability company organized and existing under the

laws of the State of New York, having a place of business located at 90 Broad Street,

New York, New York.

    2.    OnBoard provides real estate data solutions and web services, as well as

consulting services, to some of the most innovative real estate, publishing, technology,

and financial services companies.

    3.    Jonathan Bednarsh ("Bednarsh") is President and Chief Operating Officer

("COO") of OnBoard and has been since 2002 when OnBoard was founded.

    4.    Marc Siden ("Siden") is Chief Executive Officer ("CEO") of OnBoard and

has been since 2002 when OnBoard was founded.

5.     Plaintiff Robert Hahn ("Plaintiff" or "Hahn") is a graduate of Yale University and New York University School of Law.

6.     Plaintiff was employed by OnBoard as Vice President of Marketing commencing on or about September 17, 2007.

7.     OnBoard has been profitable since its inception in 2002 and has not experienced any financial difficulties since inception through to date including, but not limited to, during the term of Plaintiff's employment by OnBoard.  Since its inception in 2002, OnBoard has never laid off and/or terminated any employees for financial reasons, nor were any layoffs and/or economically-motivated staff reductions discussed and/or anticipated by OnBoard's senior management during Plaintiff's employment by OnBoard.

8.     Plaintiff did not have authorized access to OnBoard's financial records, profit and loss statements, and/or general ledger during his employment with OnBoard.

**B.     Plaintiff Admittedly, Unequivocally and Unambiguously Resigned From His Employment With OnBoard on May 5, 2009, Which Resignation Plaintiff Carefully And Meticulously Planned And Premeditated Well In Advance Of May 5, 2009**

9.     The terms and conditions of Hahn's employment by OnBoard were set forth in a written agreement (the "Employment Agreement"), which was negotiated extensively by Plaintiff and OnBoard and executed on or about September 19, 2007.

10.     The Employment Agreement does not contain any provision entitling Plaintiff to any remuneration whatsoever in the form of, *inter alia*, a bonus, Exit Event payment (as that term is defined therein), or severance in the event of his voluntary resignation, which occurred on May 5, 2009 when Plaintiff resigned from his employment at OnBoard.

11.     In point of fact, the Employment Agreement provides, in relevant part, at Section 7.1: "If you terminate your employment, you will forfeit any bonus remaining in the period in which you are terminated and any vested and/or unvested interest in an Exit Event."

12.     The Employment Agreement does not provide for payment of any severance by OnBoard to Plaintiff in the event that Plaintiff resigned voluntarily from his position at OnBoard, which he did on May 5, 2009.

13.     Plaintiff has readily admitted that in or about April 2009, the month before he claims he was terminated by OnBoard, while employed by OnBoard, he told his likely successor, Stacey Ret, an employee in OnBoard's Marketing Department and a personal friend of Plaintiff's, that she "should get ready to take over the Marketing Department" at OnBoard.   When Ms. Ret pressed Plaintiff as to whether that meant he was leaving OnBoard, he confirmed that he was and also eagerly replied, in sum or substance, that it was time for him to move on.  Notably, although Plaintiff has made a conclusory contention that this conversation purportedly related to his belief that he was going to be laid off by OnBoard due to alleged financial constraints, Plaintiff admitted and Stacey Ret confirmed that during that April 2009 conversation, Plaintiff never said to Stacey Ret that he thought he was going to be laid off and that that was the reason why he was going to leave OnBoard.  Again, at no time in its history did OnBoard ever fire, or contemplate firing, anyone for financial reasons.

14.     All while continuing to collect a paycheck from OnBoard in the months leading up to his resignation from OnBoard, Plaintiff surreptitiously planned, established and rendered fully operational his competing business (7DS Associates, LLC ("7DS")) so

3

that he would be ready to make a seamless transition to start working at 7DS the moment he resigned from OnBoard.

15.     During that period, while Plaintiff was still employed by OnBoard, Hahn secretly used his time at OnBoard to lay the groundwork for his next business venture and to start a competing business (namely, 7DS).

16.     It is uncontroverted that on April 27, 2009, a mere eight (8) days before he claims he was terminated, while employed by OnBoard, Plaintiff registered the domain name for his new company, 7DS (www.7dsassociates.com).

17.     Glaringly, even when confronted at his deposition with a printout from the WhoIs registry, which Plaintiff admitted is a "trusted source of information" and which "contains accurate information", Plaintiff incredibly attempted to dispute the WhoIs registry's unambiguous documentation that he registered his 7DS domain name for his competing business on April 27, 2009 (eight (8) full days before he resigned from OnBoard).  Later, however, in the face of GoDaddy.com's Certificate of Authenticity and domain registration documents, which GoDaddy produced in response to OnBoard's Subpoena, Plaintiff retreated from his lie, admitting "that he registered a domain name, '7DSassociates.com,' sometime at the end of April or beginning of May 2009."

18.     Indeed, Hahn admitted that on April 28, 2009, seven (7) days before he claims he was fired, at a meeting with Siden, Hahn offered his voluntary resignation to Siden and pitched Siden on the concept of Hahn becoming an outside consultant to OnBoard and having OnBoard as his client, which he admitted was his goal at the time. Plaintiff further unambiguously confirmed that he would not have made that offer to Siden on April 28, 2009 (at a time when, admittedly, OnBoard was his sole source of

income), if he did not consider before making that offer "am I going to have a way to make money if Mr. Siden, my boss, takes me up on this plan, a 'Plan B'". And Hahn further admitted that 7DS (whose domain name he registered one (1) day earlier on April 27, 2009, with the hope of getting OnBoard as 7DS's client) *was* that Plan B. Notably, as Plaintiff conceded, Siden unequivocally rejected Hahn's unsolicited resignation on April 28, 2009, instead advising Plaintiff that Siden "need[ed]" Hahn to remain at OnBoard on a full-time basis.

19.     Hahn registered his company 7DS with the State of New Jersey on May 5, 2009.

20.     Like OnBoard, 7DS is in the business of real estate consultancy, and acts as a strategic advisor to the real estate industry and to real estate brokers, and is, therefore, a direct competitor of OnBoard's.

21.     On May 5, 2009, after having set up his competing company, 7DS, and laying the foundation for 7DS by using OnBoard's time and resources, Plaintiff resigned from his position at OnBoard, which resignation was wholly and completely premeditated and carefully and meticulously planned by Plaintiff well in advance of May 5, 2009.

22.     On May 5, 2009, Plaintiff attended a regularly scheduled status meeting with Siden and Bednarsh in Siden's office at OnBoard. Plaintiff, Siden and Bednarsh were the only people in attendance at such meeting. The meeting lasted for approximately one (1) hour. As Plaintiff has admitted, at the May 5, 2009 meeting, he told Siden and Bednarsh that despite his having told Siden at the parties' April 28, 2009 meeting that he was on the same page with Siden in terms of OnBoard's new focus on near-term revenue

generation, that he had done a great deal of thinking over the prior week since his April 28, 2009 meeting with Siden and determined that he, in fact, could not get behind OnBoard's new focus on near-term revenue generation.  Moreover, as Plaintiff has also admitted, at the May 5, 2009 meeting, he confessed to Siden and Bednarsh, in no uncertain terms, that his "head was no longer in the game", that he just didn't want to be at OnBoard anymore and that he no longer wanted to work for OnBoard.  Plaintiff then unequivocally and decisively resigned at such May 5, 2009 meeting.

23.     Plaintiff further conceded that at his May 5, 2009 meeting with Siden and Bednarsh, he told them that he was feeling ill on Friday, May 1, 2009, but that if he was really into his job, really cared about it, he would have dragged himself into the office, but he wasn't.

24.     Plaintiff has admitted that at no point during the May 5, 2009 meeting did Siden or Bednarsh state to Plaintiff "you're fired" or "you're terminated."

25.     Plaintiff has also repeatedly confirmed that he does not have a clear recollection of what Siden or Bednarsh said at the May 5, 2009 meeting and that, in point of fact, his recollection of what transpired and/or was said at the May 5, 2009 meeting is admittedly "hazy."

26.     Tellingly, at the conclusion of the May 5, 2009 meeting, as Plaintiff has confirmed, Plaintiff asked Siden and Bednarsh if, despite the fact that he was "resigning", they could position his "resignation" as a layoff or job cut so that he could claim unemployment benefits. Hahn also admitted to Siden and Bednarsh that he did not want anything out of the situation; he said he knew he was resigning and would not be entitled to anything.

27.     During the May 5, 2009 meeting at which Plaintiff resigned from his position at OnBoard, Siden and Bednarsh asked Plaintiff to stay on at OnBoard until the end of the week and offered to continue to pay him his salary through May 15, 2009 and to continue his family health benefits through the end of the month.  At that meeting, they also briefly discussed a transition strategy for dealing with Plaintiff's resignation from OnBoard.  At the conclusion of the meeting, Bednarsh advised Hahn that he would reach out to Hahn later that day about meeting the following day to discuss transition and messaging Hahn's resignation to other OnBoard employees, clients and the public.

28.     Plaintiff has repeatedly confirmed that, at the conclusion of the May 5, 2009 meeting, he stated to Siden and Bednarsh, in sum or substance, that he did not intend to cause any harm, that he only had respect for Siden and Bednarsh, and that he did not intend for things to work out this way.

29.     Glaringly, in Plaintiff's Second Amended Complaint, interrogatory responses, at his deposition and during his trial testimony, Hahn gave varying versions of what happened at the May 5, 2009 meeting: (a) on the one hand, OnBoard purportedly terminated Hahn without cause and, on the other hand, OnBoard allegedly terminated Hahn with cause; (b) on the one hand, Siden and Bednarsh asked Hahn to leave the building at the conclusion of the meeting and, on the other hand, he left of his own "free will"; (c) on the one hand, Siden told Hahn that "if you don't resign, you will be fired with cause" and, on the other hand, no mention was made of that alleged statement; and (d) on the one hand, Hahn was "summoned" to the May 5, 2009 meeting and, on the other hand, he showed up to that meeting as a regularly scheduled meeting.

30.     It is undisputed that when an employee is terminated from OnBoard, there

is a specific and consistent sequence of events and procedures that are and have always been followed. First, the Human Resources Manager is informed by a manager or an executive of OnBoard that the termination is going to occur, and she drafts a Termination Memorandum. She then informs the IT Department of the exact time that the termination is going to occur. After that, a meeting is held with the Human Resources Manager, the employee who is being terminated, and the employee's direct supervisor/manager. The Termination Memorandum is presented to the employee at the meeting. While the meeting is going on, the IT Department deactivates the employee's passwords and locks the employee out of all systems. Directly following the meeting, the Human Resources Manager escorts the former employee to his or her desk to collect any personal effects and then escorts the terminated employee out of OnBoard's offices.

31.    As Plaintiff has necessarily conceded, it is undisputed that none of the above-listed events associated with OnBoard's company protocol for dealing with terminated employees occurred with regard to Plaintiff on May 5, 2009 or at any time.

32.    It was OnBoard's company policy and practice across the board to always require terminated employees to surrender any and all OnBoard property, including, but not limited to, company laptop computers, Blackberries/cell phones, access/pass cards, and company credit cards to OnBoard immediately upon termination.

33.    Plaintiff has admitted that he was not asked to or required to surrender his company laptop, Blackberry, access/pass card and/or any other OnBoard property at or immediately following the May 5, 2009 meeting. In point of fact, Plaintiff has conceded that he was permitted to and did retain his company laptop computer, Blackberry, and access/pass card following the May 5, 2009 meeting (at which Plaintiff contends he was

fired), which access card Plaintiff uncannily admitted gave him unfettered access to unlock OnBoard's office doors and walk into and around OnBoard's offices (where it maintained proprietary and confidential information) unescorted.

34.    Plaintiff has likewise conceded that he was not asked to surrender his company credit card at or immediately following the May 5, 2009 meeting. In point of fact, he was permitted to and did retain his company credit card immediately following the May 5, 2009 meeting. While Plaintiff contended that OnBoard's permitting him to retain these materials was merely an agreed "cover" of his purported termination, Plaintiff readily admitted that there would be no purpose whatsoever in OnBoard allowing a terminated employee to retain his or her company Blackberry, laptop computer, corporate credit card, office access/pass card, and/or unrestricted access to OnBoard's computer system.

35.    Further, and most telling, Plaintiff also admitted that there was no cover purpose in having him retain his OnBoard credit card in his wallet, where no one could see it.

36.    As a matter of OnBoard's company policy and practice, Cheryl Crouse, OnBoard's then Human Resources Manager, was always present in person whenever an employee was terminated by OnBoard during Ms. Crouse's tenure at OnBoard. Ms. Crouse was not present at the May 5, 2009 meeting between Plaintiff, Siden and Bednarsh because Plaintiff was not terminated at that meeting.

37.    As Plaintiff has acknowledged, it was OnBoard's company policy and practice to immediately and permanently cut off an employee's access to OnBoard's office and computer system following his or her termination. Yet, it is undisputed that

Plaintiff retained unabated access to OnBoard's office (via Hahn's company-issued access/pass card), unrestricted access to send and receive emails from Plaintiff's OnBoard e-mail account, and unhampered access to OnBoard's computer system (including access to OnBoard's highly confidential and proprietary documents and information) immediately following the May 5, 2009 meeting.

38.     Despite the fact that it was OnBoard's company policy and practice to escort terminated employees from OnBoard's offices immediately following their terminations, Plaintiff admitted that he was not escorted from OnBoard's offices following the May 5, 2009 meeting, which Plaintiff has acknowledged concluded on friendly terms.  Rather, as Plaintiff has repeatedly conceded, he left OnBoard's offices on May 5, 2009 unescorted and of his own "free will".

39.     Following his resignation from OnBoard on May 5, 2009, without any direction, instruction, provocation, or suggestion from OnBoard, Plaintiff sent a purported "cover" email to other employees at OnBoard from Plaintiff's OnBoard email account falsely advising them that his child was ill and that he, therefore, needed to leave the office, a statement that Plaintiff admitted was entirely fabricated and was concocted by him alone, without any input and/or knowledge on the part of Siden or Bednarsh.

40.     Plaintiff is not aware of and cannot identify any acts whatsoever on behalf of OnBoard that are consistent with Plaintiff having been terminated by OnBoard.

41.     Glaringly, Plaintiff is admittedly aware of many more acts consistent with him resigning rather than being fired from OnBoard.

42.     Following his voluntary resignation from OnBoard, Plaintiff did not seek

and/or obtain any unemployment benefits and/or compensation.

43.     Plaintiff does not recall specifically where he went and/or what he did in the hours immediately following the May 5, 2009 meeting at which he claims he was terminated by OnBoard.

44.     Promptly following the May 5, 2009 meeting, consistent with what was discussed at the meeting, on May 5, 2009, Bednarsh sent an e-mail invitation to Hahn inviting Hahn to come to OnBoard the following day (May 6, 2009) to discuss (a) messaging Hahn's resignation to OnBoard's other employees, its customers and the public; and (b) transitioning Hahn's duties to others at OnBoard.

45.     Later that same day, on May 5, 2009, Hahn e-mailed back to Bednarsh Hahn's declination of that invitation.  The following day, May 6, 2009, Hahn sent another fabricated e-mail to everyone at OnBoard, again falsely claiming that he would be out the next day because his child was sick, which Hahn admittedly concocted on his own without the input or knowledge of Siden or Bednarsh.

46.     Later that day, on May 6, 2009, Bednarsh sent Hahn an e-mail advising him that Hahn's "cover" was not working, that his behavior was disruptive to the rest of OnBoard's staff, and that he and Siden expected Hahn to be at the office the next day to finalize the arrangement concerning Hahn's resignation as discussed at their meeting on May 5, 2009.  On the evening of May 6, 2009, Hahn sent Bednarsh an e-mail in which, for the first time, Hahn falsely claimed that he was terminated.

### C.     Plaintiff Breached His Duty Of Loyalty To OnBoard

47.     Plaintiff was disloyal to OnBoard throughout his employment by OnBoard and increasingly so in the months leading up to his resignation therefrom.  Such

disloyalty was evidenced by, *inter alia*: (a) Plaintiff's promotion of his own personal

business while employed by OnBoard, in lieu of and to the detriment of, the promotion of

OnBoard's business; (b) Plaintiff's solicitation of one of OnBoard's clients while he was

employed by OnBoard, which client admittedly became a client of Hahn's immediately

after he left OnBoard; (c) Plaintiff's feigning an illness and taking a paid sick day, so he

could work on his own personal, public blog that day; (d) Plaintiff's intentionally

ignoring substantial calls made to him by OnBoard's senior management to address a

significant e-mail debacle generated by Hahn's marketing department, which caused

hundreds if not a thousand e-mails to be sent to clients and others which should not have

been sent; and (e) during the last two (2) months of his employment with OnBoard,

Plaintiff's wholesale and voluntary neglect, abandonment, disengagement and drastic

lessening of the work that he performed on behalf of OnBoard.

### i.    Plaintiff Openly And Flagrantly Promoted Himself And His Own Competing Business, Rather Than OnBoard, At The Leading RE Conference While Employed By OnBoard

48.    On or about March 24, 2009, Plaintiff intentionally deceived Bednarsh and

Siden into allowing and paying for Plaintiff to attend a real estate conference in

Scottsdale, Arizona (the "Leading RE Conference") purportedly in Plaintiff's capacity as

OnBoard's Vice President of Marketing and on behalf of OnBoard.  More than

requesting, Plaintiff pitched Siden and Bednarsh to let him attend the Leading RE

Conference under the guise that there were many potential customer leads and other

business opportunities for Plaintiff to pursue there on OnBoard's behalf.  However, in

point of fact, Plaintiff's actual motive and intention was to convince OnBoard to incur the

substantial costs associated with Plaintiff attending such conference (in addition to

OnBoard paying Plaintiff's salary during the five-day conference) while Plaintiff disloyally, deceptively, and surreptitiously used the Leading RE Conference as an opportunity to promote his own personal brand and business.

49. Bednarsh and Siden were duped by Plaintiff into believing that there were significant new business prospects and other advantageous networking possibilities for OnBoard at the Leading RE Conference that Plaintiff would pursue on behalf of OnBoard and, therefore, Bednarsh and Siden agreed that it would be a worthwhile expenditure of Plaintiff's (and, thus, OnBoard's) time and OnBoard's money to send Plaintiff to the Leading RE Conference for the sole purpose of promoting OnBoard.

50. Unbeknownst to Siden and Bednarsh, who relied on Plaintiff's explicit representations to them that he would be attending and participating in the Leading RE Conference solely on behalf of and for the benefit of his employer, OnBoard, Plaintiff's undisclosed objective in attending the Leading RE Conference was to continue to lay the groundwork for his competing business at OnBoard's cost and expense.

51. Plaintiff attended the Leading RE Conference from March 24, 2009 through March 28, 2009 where Plaintiff wholly and completely failed to represent OnBoard in any meaningful way and, instead, promoted, represented, and acted on behalf of his own personal business, which acts of disloyalty and disengagement were witnessed and confirmed by, *inter alia*, multiple OnBoard employees.

52. Plaintiff had already registered 7DS's domain name, formed 7DS or was in the process of setting it up at the time of the Leading RE Conference and, thus, despite the fact that he was employed by OnBoard at the time and had convinced OnBoard to pay for him to attend the Leading RE Conference on behalf of and for OnBoard's benefit,

Plaintiff's sole focus at the Leading RE Conference was promoting 7DS and Plaintiff's personal blog (Notorious R.O.B.), rather than OnBoard.

53.      At the Leading RE Conference, Plaintiff did not spend any time working at OnBoard's booth; he only briefly, sporadically, and casually stopped by the booth in passing to say hello to the other OnBoard employees who were diligently and loyally working at the booth on behalf of their employer, OnBoard.

54.      Other OnBoard employees who attended the Leading RE Conference noticed that Plaintiff overtly and disloyally failed to act as if he was affiliated with OnBoard, that he would not make himself available to OnBoard and/or his OnBoard colleagues at the Leading RE Conference, and that Plaintiff was actively, brazenly, and publicly promoting his own, personal business (including his blog, Notorious R.O.B.), rather than OnBoard, to OnBoard's detriment, at the Leading RE Conference.

55.      While at the Leading RE Conference, Plaintiff spent almost all of his time focused on promoting himself and his personal brand, rather than OnBoard, in direct contravention of his representations to Siden and Bednarsh.

56.      Contrary to Plaintiff's representations to Bednarsh and Siden that he would be attending the Leading RE Conference for the exclusive benefit of his employer, OnBoard, in point of fact, Plaintiff devoted virtually his entire time at the Leading RE Conference to marketing and soliciting clientele for one or more of his own personal businesses (7DS and www.notorious-rob.com) and/or otherwise failing to promote OnBoard's business.

57.      Plaintiff can only identify one specific person to whom he gave his

OnBoard business card while at the Leading RE Conference (Matthew Dollinger, who is, notably, a close, personal friend of Plaintiff's) and does not recall the name(s) of *any* prospective OnBoard clients with whom he purportedly met for any period of time at the Leading RE Conference.

58.     In stark contrast to his utter failure to promote OnBoard in any meaningful way whatsoever and his admitted failure to distribute his OnBoard business card at the Leading RE Conference, Plaintiff has unabashedly confirmed that he distributed as many as approximately two (2) dozen of his personal business cards (relating to his personal blog, Notorious R.O.B.) at the Leading RE Conference.

59.     Plaintiff has admitted that he possessed and used for the promotion of his blog, Notorious R.O.B., his "personal business cards" while employed by OnBoard, which personal business cards were found at Plaintiff's desk at OnBoard following Plaintiff's resignation from OnBoard on May 5, 2009.

60.     Plaintiff blatantly lied in his responses to Defendant's First Set of Interrogatories by falsely stating that, prior to leaving his employment with OnBoard, he "didn't have personal business cards." Plaintiff admitted this lie only after he was confronted at his deposition with a stack of his personal business cards that OnBoard found at Plaintiff's desk after Plaintiff resigned.

61.     Plaintiff's personal business cards contained Plaintiff's personal email address, personal blog address, personal cell phone number, and personal twitter account information. At no point did Plaintiff's personal business cards contain Plaintiff's OnBoard e-mail address, OnBoard telephone number or any other OnBoard

contact information, nor did Plaintiff's personal business cards reference Plaintiff's employment with OnBoard in any way.

62.     Notwithstanding Plaintiff's preposterous claim that his personal blog, Notorious R.O.B., was for the promotion of OnBoard's business, Plaintiff plainly admitted that he never received *any* prospective or actual business leads and/or clients for OnBoard from Plaintiff's personal blog and that he rarely and infrequently mentioned OnBoard on his personal blog.  Plaintiff also conceded that during Plaintiff's employment with OnBoard, OnBoard had its own blog and website which it utilized for marketing.

ii.     **Plaintiff Was Increasingly Disloyal To OnBoard And Admittedly Disengaged From His Position Therewith During The Period Leading Up To His Planned Resignation From OnBoard**

63.     Plaintiff admitted that for a period of approximately two (2) months leading up to his voluntary resignation from OnBoard on May 5, 2009, he was entirely disengaged from and demoralized with his employment with OnBoard.  Plaintiff's wholesale, admitted disengagement from OnBoard is confirmed by, *inter alia*, the undisputed fact that, during March and April 2009, Plaintiff was increasingly and inexcusably late and/or absent from OnBoard while he was distracted by and wholly preoccupied with setting up 7DS and preparing for his carefully planned, voluntary departure from OnBoard.

64.     Plaintiff readily admitted that he was openly critical of at least one of OnBoard's clients while he was employed by OnBoard and that his public attacks on OnBoard's client(s) did not benefit and, in point of fact, hindered OnBoard's relationship with such client.

65.      Specifically, prior to May 5, 2009, one of OnBoard's clients complained that on at least two (2) occasions Hahn posted hostile comments on his personal blog that were highly critical of and maligned such client.  Notably, Plaintiff conceded that it was completely understandable and justifiable that Siden and Bednarsh would object to and disapprove of Plaintiff using his personal blog to openly criticize one of OnBoard's clients to OnBoard's detriment.  Moreover, Plaintiff has also conceded that openly criticizing one of OnBoard's clients on Plaintiff's personal, public blog was not at all helpful and/or conducive to OnBoard's business relationship with such client.   Thus, Plaintiff openly, intentionally and affirmatively maligned OnBoard's client knowing that his comments and attacks would detrimentally affect OnBoard's business relationship with such client and, thus, would correspondingly harm OnBoard.

66.      Plaintiff used his public, online blog to malign OnBoard's client not once, but twice, even after being reprimanded for the first instance and being asked to take the offending post off of his blog, which he did not do.

67.      Plaintiff's public criticisms of OnBoard's client negatively affected OnBoard's relationship with such client and required Siden and Bednarsh to put substantial input and time into the reparation of that relationship.

68.      Plaintiff has also admitted that, while he was employed by OnBoard, he bought a reference book during the work day to learn how to migrate his personal blog (www.notorious-rob.com) to a different hosting platform.  Plaintiff has admitted that he charged the reference book to his OnBoard credit card, never reimbursed OnBoard for such charge, and never requested and/or received appropriate authorization from OnBoard to charge such book to OnBoard's credit card.

69.     Shockingly, during an extensive and prolonged period of five (5) days --
*i.e.*, from April 30, 2009 through May 4, 2009 -- despite the fact that Plaintiff was
admittedly a very reachable person, Plaintiff intentionally and deliberately ignored
multiple, urgent attempts by OnBoard's CEO, CIO (Peter Goldey ("Goldey")), Siden and
others at OnBoard to contact him to contend with a major marketing and public relations
mishap for which Plaintiff, as Vice President of Marketing, was directly responsible.

70.     Specifically, on April 30, 2009, hundreds of (and possibly as many as one
thousand) client satisfaction surveys were improperly emailed to people in OnBoard's
database by OnBoard's Marketing Department, which department Hahn directly
supervised as Vice President of Marketing.  Hahn was not at OnBoard's office when the
survey was emailed during business hours and admittedly, intentionally ignored multiple
efforts by OnBoard's senior management to get in touch with him in order to promptly
address and remedy the crisis concerning the erroneously mass-distributed survey on that
date.

71.     Despite the fact that Plaintiff was admittedly well-aware that OnBoard's
senior management and others were searching for him "high and low" in order to attend
to and attempt damage control concerning the erroneous, mass-distribution of the survey,
and despite Plaintiff's awareness that hundreds of (and possibly one thousand) client
surveys were mistakenly mass-distributed, Plaintiff has admitted that he nevertheless
willfully chose not to respond to OnBoard's senior management's repeated
communications to Plaintiff.

72.     For example, immediately after the survey was improperly mass-

18

distributed, Hahn was notified via an urgent e-mail from Goldey that such client catastrophe had occurred and, yet, Plaintiff admittedly, intentionally ignored and failed to respond thereto despite receipt of Goldey's e-mail.

73.    Moreover, after the client surveys were erroneously mass e-mailed, Siden, the CEO of Plaintiff's employer, OnBoard, also immediately e-mailed Plaintiff and asked him to review and handle what had happened because such improper distribution was a major client catastrophe with potentially severe negative repercussions for OnBoard. Nevertheless, Plaintiff admittedly, intentionally ignored Siden's email despite receipt thereof.  Siden again emailed Plaintiff a few hours later and asked him to reach out to Goldey "ASAP"; Plaintiff conceded that he deliberately and intentionally ignored this e-mail as well.

74.    Likewise, Goldey e-mailed others at OnBoard and again copied Plaintiff on such email regarding the survey crisis; again, Plaintiff chose not to respond to such e-mail despite receipt thereof.

75.    To add insult to injury, while all of this was going on, and Plaintiff was deliberately ignoring OnBoard's senior management's repeated efforts to reach him, on May 1, 2009, in an e-mail to Siden and Cheryl Crouse (OnBoard's then Human Resources Manager), Plaintiff feigned illness by saying he would be out sick that day because he "could barely get out of bed" and it might be "the swine flu deal".  Tellingly, as Plaintiff has confirmed, if he was really into his job at OnBoard and committed to his position at OnBoard, he would have come to work on May 1, 2009.

76.    Shockingly, on May 1, 2009, while being paid by OnBoard, feigning illness, and continuing to intentionally ignore a major public relations crisis that occurred

at OnBoard by the Marketing Department, which department Plaintiff supervised, Plaintiff devoted the majority of that day to writing extensively on his personal, public blog, migrating his personal blog to a different format, and tweeting.

77.     Moreover, during the months leading up to his May 5, 2009 resignation, Plaintiff was consistently late and/or absent, and repeatedly skipped the majority of the mandatory, company-wide OnBoard meetings that he was required to attend.  As Plaintiff has readily admitted, on May 4, 2009, he failed to show up to a mandatory, company-wide meeting, which was the 20th out of the prior 26 such company-wide meetings that Plaintiff missed.

> ### iii.     Plaintiff Admittedly, Actively Solicited MRIS, A Known Client of OnBoard's, For Plaintiff's Competing Business While Plaintiff Was Employed By OnBoard

78.     MRIS was a client of OnBoard's while Hahn was employed by OnBoard, and Hahn was admittedly well-aware that MRIS was a client of OnBoard's while Hahn was employed by OnBoard.

79.     Indeed, on or about November 7, 2008, Plaintiff sent an email to Siden and others at OnBoard in which he stated regarding MRIS "I thought we should reach out to them seeing as how they are a client of ours."

80.     While still employed by OnBoard, Plaintiff began soliciting MRIS as a client for Plaintiff's own competing company (7DS) as early as at the Leading RE Conference or even earlier, in connection with Plaintiff's ongoing efforts to lay the foundation and groundwork for 7DS prior to his carefully planned, voluntary departure from OnBoard.

81.     As Plaintiff has readily admitted, at the Leading RE Conference and/or

even at an earlier conference, Plaintiff may have given his personal business card to Dave Charron ("Charron") and/or other employee(s) of MRIS.

82.     Charron is not certain when he first communicated with Plaintiff, but believes that it is possible that he first communicated with Plaintiff via telephone as early as May 2009.  During such conversation, Plaintiff did not mention his affiliation with OnBoard, and Charron claims that he was not aware whether Plaintiff was employed (by OnBoard or otherwise) at the time.  Following such telephone conversation, Charron and Plaintiff met in person for lunch, and Charron claims that he was not aware at that point whether Plaintiff was employed (by OnBoard or otherwise).

83.     It is undisputed that MRIS became a client of 7DS in or about June 2009, soon after Plaintiff voluntarily resigned from his employment with OnBoard.

84.     MRIS notified OnBoard on or about December 15, 2009 that it would not be renewing its contract with OnBoard.

85.     MRIS advised OnBoard that the decision to terminate and/or not to renew its contract with OnBoard was the result of "new leadership", *i.e.*, Hahn, who was employed by MRIS from approximately January 2010 to May 2010, and whose company, 7DS, had become engaged by MRIS in or about June 2009.

86.     Although MRIS has recently entered into a new contract with OnBoard, by virtue of the foregoing, OnBoard lost MRIS as a client for an approximately eighteen (18) month period.

**D.      Plaintiff Admittedly Removed and Retained Hundreds of Pages of Highly Confidential And Proprietary Documents From OnBoard's Offices Without Authorization In Direct, Knowing Violation Of The Employment Agreement**

87.     The Employment Agreement contains a confidentiality provision that

provides, in relevant part, at Section 4.1 that "You acknowledge that as an employee of OnBoard you will have access to confidential information which relates to the business of OnBoard. You shall, during your employment with OnBoard <u>and at all times thereafter,</u> treat all confidential material...of OnBoard confidentially. You shall not, without the prior written consent of the President, disclose such confidential material, directly or indirectly, to any party <u>or remove from OnBoard's premises</u> any notes or records relating thereto, copies or facsimiles thereof (whether made by electronic, electrical, magnetic, optical, laser, acoustic or other means), or any other property of OnBoard." (emphasis added).

88.     Plaintiff admittedly and deliberately removed from OnBoard's premises and retained for a lengthy and protracted period of two (2) years after his resignation from OnBoard hundreds of pages of highly confidential and proprietary OnBoard documents without authorization and did not return such documents (despite multiple demands, including written demands to Hahn's prior counsel, therefor) or disclose to OnBoard that he had removed such confidential and proprietary OnBoard materials until he produced copies of such documents in this litigation in response to OnBoard's discovery requests.

89.     Plaintiff did not provide OnBoard with purported written confirmation that Plaintiff's electronic copies of OnBoard's confidential and proprietary documents were erased from Plaintiff's computer and/or destroyed until as late as June 6, 2011, the day before the trial in this action commenced.

90.     Plaintiff has admitted that he cannot prove that he has not used or

disclosed any of OnBoard's confidential and proprietary documentation for, *inter alia*, 7DS, his separate, competing business, since leaving OnBoard.

## II.    Findings of Law

### A.    Applicable Legal Standards

#### i.    New York Law Applies To And Governs Plaintiff's Claim And OnBoard's Counterclaims In This Action

1.    Plaintiff's claim against OnBoard and OnBoard's counterclaims against Plaintiff must be construed under New York law, which is the substantive law of "the jurisdiction with the most significant relationship and closest contacts with the transaction and the parties." *Pepe v. Rival Co.*, 85 F. Supp. 2d 349, 380 (D.N.J. 1999), *aff'd*, 254 F.3d 1078 (3d Cir. 2001).

2.    New Jersey courts have consistently applied the law of the state of employment to disputes concerning employment matters. *See, e.g., Satz v. Taipina*, No. CIV.A. 01-5921, 2003 WL 22207205, at *16 (D.N.J. Apr. 15, 2003), *aff'd*, 122 F. App'x 598 (3d Cir. 2005); *Babcock v. Sears, Roebuck & Co.*, No. L-4881-01, 2005 WL 3533568, at *3 (N.J. Super. Ct. App. Div. Dec. 28. 2005); *Kelman v. Foot Locker*, No. CIV A 05-CV-2069, 2006 WL 3333506, at *6 (D.N.J. Nov. 16, 2006); *Giovanetti v. ICI Americas, Inc.*, No. L-0743-01, 2006 WL 1520756, at *3 (N.J. Super. Ct. App. Div. June 5, 2006).

#### ii.    Breach of Duty of Loyalty

3.    Every employment contract imposes a duty of loyalty, even in the absence of an express provision referencing or purporting to create such a duty. *See DDS Partners, LLC v. Celenza*, 16 A.D.3d 114, 115, 794 N.Y.S.2d 1, 2 (N.Y. App. Div. 2005).

4.      An employee has "an affirmative duty at all times to act in [his or her] employer's best interests." *Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc.*, 100 A.D.2d 81, 89, 474 N.Y.S.2d 281, 286 (N.Y. App. Div. 1984).

5.      New York courts have broadly, liberally, and inclusively defined the conduct by an employee that gives rise to a breach of duty of loyalty claim. *See W. Electric Co. v. Brenner*, 41 N.Y.2d 291, 295, 392 N.Y.S.2d 409, 412 (N.Y. 1977) ("[A]n employee who...receives a benefit in connection with transactions conducted by him on behalf of his employer is under a duty to give such profit or benefit to his employer...."); *see also Mega Group Inc. v. Halton*, 290 A.D.2d 673, 676, 736 N.Y.S.2d 444, 447 (N.Y. App. Div. 2002) (using employer's "time and resources to create a competing business" constitutes a breach of the employee's duty of loyalty to employer).

6.      An employee breaches his duty of loyalty to his employer by lessening the work that he performs on behalf of his employer during the term of his employment. *See, e.g., Great Am. Trucking Co., Inc. v. Swiech*, 267 A.D.2d 1068, 1068, 700 N.Y.S.2d 632, 633 (N.Y. App. Div. 1999).

7.      An employee breaches his duty of loyalty by soliciting his employer's clients; the solicitation need not be successful to prove a breach of the duty of loyalty. *See, e.g., A & L Scientific Corp. v. Latmore*, 265 A.D.2d 355, 696 N.Y.S.2d 495 (N.Y. App. Div. 1999); *Bender Ins. Agency, Inc. v. Treiber Ins. Agency, Inc.*, 283 A.D.2d 448, 729 N.Y.S.2d 142 (N.Y. App. Div. 2001); *Catalogue Service of Westchester, Inc. v. Wise*, 63 A.D.2d 895, 405 N.Y.S.2d 723 (N.Y. App. Div. 1978); *Westwood Chemical Co., Inc. v. Kulick*, 570 F. Supp. 1032, 1036-37 (S.D.N.Y. 1983) (holding that employees committed "egregious breaches" of duty of loyalty; "as long as the employment

relationship continues, an employee is prohibited from conspiring to take away his employer's customers or to establish a competing business"); *Cameco, Inc. v. Gedicke*, 299 N.J. Super. 203, 690 A.2d 1051 (N.J. Super. Ct. App. Div. 1997), *aff'd as modified*, 157 N.J. 504, 724 A.2d 783 (N.J. 1999).

8.      A breach of the duty of loyalty may be established indirectly by circumstantial or inferential evidence. *See, e.g., Botwinick v. Duck Corp.*, 267 A.D.2d 115, 116, 700 N.Y.S.2d 143, 144 (N.Y. App. Div. 1999); *Derven v. PH Consulting, Inc.*, 427 F. Supp. 2d 360, 371 (S.D.N.Y. 2006); *Maritime Fish Prods.*, 100 A.D.2d at 89-90, 474 N.Y.S.2d at 286-87.

9.      An employer is entitled to recover any salary or other compensation paid to an employee during the employee's period of disloyalty. *See Maritime Fish Prods.*, 100 A.D.2d at 91, 474 N.Y.S.2d at 287; *Peregrine Myanmar Ltd. v. Segal*, No. 95 Civ. 8286, 1996 WL 572211, at *6 (S.D.N.Y. Oct. 4, 1996), *aff'd*, 116 F.3d 466 (2d. Cir. 1997).

10.      In addition to recovery of a disloyal employee's salary and commissions, an employer is also entitled to recover any and all expenses paid by the employer on behalf of the employee during the employee's period of disloyalty. *Henderson v. Rep Tech, Inc.*, 162 A.D.2d 1028, 1028, 557 N.Y.S.2d 224, 225 (N.Y. App. Div. 1990).

11.      An employer is entitled to recover damages for the wrongful diversion of its business measured by the "opportunities for profit on the accounts diverted from it through" a disloyal employee's conduct. *Maritime Fish Prods.*, 100 A.D.2d at 91, 474 N.Y.S.2d at 287 (quotations omitted); *Gomez v. Bicknell*, 302 A.D.2d 107, 114, 756 N.Y.S.2d 209, 214 (N.Y. App. Div. 2002).

### iii.   Breach of Confidentiality Provision in Employment Agreement

12.   An employer is entitled to an injunction barring a former employee from using confidential information removed from the employer's premises in violation of an employment agreement's confidentiality provision. *See, e.g., Ikon Office Solutions, Inc. v. Usherwood Office Technology, Inc.*, No. 9202-08, 2008 WL 5206291, at *7 (N.Y. Sup. Ct. Dec. 12, 2008); *Estee Lauder Companies Inc. v. Batra*, 430 F. Supp. 2d 158, 182 (S.D.N.Y. 2006).

### B.   Conclusions of Law

By virtue of the foregoing facts and applicable legal standards, this Court renders the following conclusions of law:

### i.   Plaintiff Voluntarily Resigned From His Employment With OnBoard On May 5, 2009

1.   Due to Plaintiff's unequivocal, premeditated, voluntary resignation from his employment with OnBoard on May 5, 2009, Plaintiff is not entitled to any severance payment and/or other remuneration from OnBoard including, without limitation, any Exit Event payment, if any, as and when any such "Exit Event" may arise, as per the express terms of the Employment Agreement.

### ii.   Plaintiff Breached His Duty of Loyalty To OnBoard

2.   Plaintiff failed to affirmatively act in OnBoard's interests at all times during the course of his employment with OnBoard and, in point of fact, Plaintiff's conduct during his employment by OnBoard was consistently detrimental to and competitive with OnBoard's interests.

3. By his repeated acts of disloyalty and failures to affirmatively act in OnBoard's interests, Plaintiff wrongfully diverted actual and prospective business opportunities from OnBoard.

4. OnBoard was entitled to and, in fact, did place its trust and confidence in Plaintiff as an employee of OnBoard in an important position for OnBoard, and expected that Plaintiff would act with the utmost good faith in carrying out his assigned employment responsibilities and duties, which Plaintiff failed to do.

5. Plaintiff breached his duty of good faith and loyalty to OnBoard by, *inter alia*, acting inconsistent with his agency, trust and employment.

6. Plaintiff breached his duty of good faith and loyalty to OnBoard by, *inter alia*: (a) while he was employed by OnBoard, soliciting one or more of OnBoard's clients to leave OnBoard and become a client(s) of Plaintiff's competing business (7DS); (b) advertising and promoting his new business and his blog (Notorious R.O.B.), rather than OnBoard at, *inter alia*, the Leading RE Conference; (c) laying the groundwork and setting up and conducting business for Plaintiff's competing business and blog during working hours from OnBoard's office using OnBoard's time and resources; (d) additionally using OnBoard's time, facilities, and equipment for the purpose of setting up and operating Plaintiff's competing business and/or making modifications to and/or issuing blogs from Plaintiff's personal blog; (e) misusing OnBoard's corporate assets, expertise, and confidential information for Plaintiff's personal and separate business use; and (f) lessening the work that he performed for and on behalf of OnBoard during the term of his employment by OnBoard including, without limitation, during the last two (2) months of his employment with OnBoard.

7.      As a consequence of Plaintiff's aforesaid breach of his duty of loyalty owing to OnBoard: (a) OnBoard lost business opportunities at the Leading RE Conference and otherwise; (b) Plaintiff wasted certain of OnBoard's corporate assets to fund the development of Plaintiff's new business and blog; (c) OnBoard lost at least one client (MRIS) for a period of approximately a year and a half; and (d) OnBoard suffered from diminished productivity of Plaintiff while Plaintiff was drawing a salary from OnBoard and simultaneously building his own, competing business and intentionally and repeatedly ignoring his responsibilities and duties as OnBoard's Vice President of Marketing.

       iii.    **Plaintiff Violated The Confidentiality Provision In The Employment Agreement and, Thus, OnBoard Is Entitled To An Injunction In Order To Prevent Plaintiff from Directly And/Or Indirectly Using And/Or Disclosing OnBoard's Confidential And Proprietary Information**

8.      Plaintiff removed and retained hundreds of pages of confidential and proprietary information from OnBoard's offices without authorization in direct violation of Section 4.1 of the Employment Agreement. (*See, supra,* at ¶88).

9.      OnBoard is entitled to an injunction barring Plaintiff from directly and/or indirectly disclosing and/or using OnBoard's confidential and proprietary information and/or causing any third-party and/or entity from using and/or disclosing OnBoard's confidential and proprietary information, which information and documents Plaintiff removed from OnBoard's offices without authorization and retained for over a year despite repeated demands therefor. *See, e.g., Ikon Office Solutions*, 2008 WL 5206291, at *7; *Estee Lauder Companies Inc.*, 430 F. Supp. 2d at 182.

**III.** **Damages Caused By Plaintiff's Disloyal Acts And Admitted, Unauthorized Removal and Prolonged Retention Of Confidential And Proprietary Information From OnBoard's Offices**

**A.** **Damages Caused By Plaintiff's Breach(es) of the Duty of Loyalty Owed By Him To His Employer, OnBoard**

1. OnBoard has been damaged by, *inter alia*: (a) losing business opportunities (i) at the Leading RE Conference when Plaintiff failed to adequately and affirmatively represent and/or promote OnBoard and, instead, brazenly and publicly promoted only himself, his blog (Notorious R.O.B.), and his new, competing business (7DS); and (ii) during the last two (2) months while Plaintiff was employed by OnBoard, while Plaintiff was admittedly totally disengaged from OnBoard; (b) Plaintiff wasting OnBoard's corporate assets by using OnBoard's time and resources, while he was still employed by OnBoard, to develop Plaintiff's new business (7DS) and work on his blog (Notorious R.O.B.); (c) Plaintiff's solicitation of at least one of OnBoard's existing customers (MRIS) while Plaintiff was still employed by OnBoard, which resulted in MRIS becoming a client of 7DS and not renewing its contract with OnBoard for approximately eighteen (18) months; and (d) diminished productivity of Plaintiff while he was drawing a salary from OnBoard and simultaneously building his own business during working hours including, without limitation, Plaintiff's significant lessening of the work that he performed for and on behalf of OnBoard (and his decreasing his attendance at work) during the last two (2) months of his employment with OnBoard and during the period he was at the Leading RE Conference in March 2009.

2. Plaintiff's failure to perform his duties as OnBoard's Vice President of Marketing had an unquantifiable, negative effect on OnBoard's potential and existing

29

customer relations and caused immeasurable harm to OnBoard's reputation in the industry.

3.      As a direct result of Plaintiff promoting himself, rather than OnBoard, at the Leading RE Conference, OnBoard lost countless business opportunities that it would have otherwise obtained at such conference; unfortunately, that loss is not quantifiable.

4.      Plaintiff is also liable to disgorge approximately $2,000.00 to OnBoard, which sum represents the salary and benefits paid to Plaintiff by OnBoard during the five (5) days that Plaintiff attended the Leading RE Conference, at which conference Plaintiff breached his duty of loyalty to OnBoard by failing to affirmatively represent and/or perform any work for OnBoard and, instead, promoting only himself and his own competing business and blog.

5.      Plaintiff is also required to disgorge an additional amount of approximately $9,000.00 to OnBoard, which sum represents expenses (*e.g.*, airfare and accommodations) OnBoard incurred in connection with sending Plaintiff to the Leading RE Conference.

6.      OnBoard is also entitled to recoup, and Plaintiff is require to disgorge, any and all salary (and benefits) paid by OnBoard to Plaintiff during the last two (2) months, March and April 2009, that Plaintiff was admittedly totally disengaged from his employment with OnBoard.  As such, Plaintiff is required to disgorge to OnBoard approximately $24,000, which sum represents the salary and benefits that OnBoard paid to Plaintiff for the months of March and April 2009, during which period Plaintiff was disloyal to and admittedly wholly disengaged from his duties as OnBoard's Vice President of Marketing.

7.      OnBoard is also entitled to recover an additional amount of approximately $100,500.00 from Plaintiff, which sum represents monies that OnBoard would have received from MRIS pursuant to OnBoard's contract with MRIS if MRIS had renewed such contract in December 2009 and had MRIS not ceased being a client of OnBoard's for a period of approximately a year and a half thereafter, which refusal to renew was a direct result of Plaintiff's solicitation of MRIS while he was employed by OnBoard and (through his entity 7DS) his resultant engagement of MRIS immediately following his departure from OnBoard.

8.      OnBoard is also entitled to an accounting from Plaintiff of all of the financial benefits, profits, and compensation Plaintiff has earned or will earn by virtue of his disloyal acts.

9.      In addition, given Plaintiff's intentional and particularly outrageous acts of faithlessness by competing with OnBoard while still accepting the benefits of his employment with OnBoard and deliberately concealing his faithless acts from OnBoard, punitive damages should be assessed against Plaintiff, in an amount to be determined by the Court.

**B.      Damages Caused By Plaintiff's Unauthorized Removal and Retention of OnBoard's Confidential and Proprietary Information For Plaintiff's Personal and Separate Business Use**

10.      Due to Plaintiff's admitted removal and retention of hundreds of pages of confidential and proprietary OnBoard documents from OnBoard's premises without authorization for over two (2) years (despite OnBoard's repeated requests for return of any such documents), OnBoard may have been severely and irreparably damaged in the event that Plaintiff released and/or directly or indirectly disclosed any of OnBoard's

31

confidential and proprietary information to any of OnBoard's competitor(s) and/or into the public domain and/or used OnBoard's confidential and proprietary information for Plaintiff's competing business, which damages include, but are not limited to, loss of business opportunities and competitive advantage.

11.    Plaintiff is liable to OnBoard for any and all damages sustained by OnBoard due to Plaintiff's admitted, unauthorized removal and retention of OnBoard's highly confidential and proprietary documents and information from OnBoard's offices.

12.    OnBoard is entitled to a permanent injunction enjoining Plaintiff from, *inter alia*: (a) continued retention and/or direct and/or indirect use of any of OnBoard's confidential and/or proprietary documents and/or information, and (b) directly and/or indirectly causing any third-parties and/or entities to use and/or benefit from OnBoard's confidential and proprietary documents and information.


Dated:   New York, New York
         June 24, 2011

                              *Lead and Trial Counsel:*

                              LAW OFFICES OF DAVID C. BERG


                              David C. Berg (DB4089)
                              425 Madison Avenue, 19th Floor
                              New York, New York 10017
                              (212) 829-0400

***Local Counsel:***

ARTHUR RUSSELL, ESQ.


/s/ Arthur Russell
_____
Arthur Russell, Esq.
661 Franklin Avenue
Nutley, NJ 07110
(973) 661-4545


SO ORDERED


_____
Honorable Michael Shipp
United States Magistrate Judge

33