**NOT FOR PUBLICATION**                                          **CLOSED**


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Robert Hahn, | Civil No. 09-3639 (MAS) |
| Plaintiff, | |
| v. | **OPINION & FINAL JUDGMENT** |
| OnBoard, LLC, Jonathan Bednarsh, and Marc Siden, | |
| Defendants. | |

**SHIPP, Michael A., United States Magistrate Judge**

This matter comes before the Court over an employment contract dispute (Pl.'s Trial Ex. ("P") 1 and Defs.' Trial Ex. ("D") 9 (collectively referred to as the "Employment Agreement")) between Plaintiff Robert Hahn ("Plaintiff" or "Hahn") and Defendants OnBoard, LLC ("OnBoard"), Jonathan Bednarsh ("Bednarsh"), and Marc Siden ("Siden") (collectively referred to as "Defendants" and Plaintiff and Defendants collectively referred to as the "Parties"). A three-day bench trial began on June 7, 2011 and concluded on June 9, 2011. The Court has considered the evidence adduced at trial, the Parties' legal positions, and the applicable law. The Court now enters final judgment on the merits of all pending claims.


## I.      BACKGROUND

### A.      *Jurisdiction*

This case comes before the Court based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(1), after having been removed from the Superior Court of New Jersey, Essex County,

pursuant to 28 U.S.C. § 1441(a). At the time this action was commenced, OnBoard was a corporation incorporated under the laws of the State of New York, and Plaintiff was a citizen of the State of New Jersey, residing in Millburn, New Jersey. Based on the allegations set forth in the Second Amended Complaint, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. (Docket Entry Number ("Doc. No.") 38 ("2d Amend. Compl."); Doc. No. 37 (Defs.' "Answer" ¶ 64(a).)

### B.   *Procedural History*

This action, originally brought by Plaintiff in New Jersey Superior Court, was removed to this Court by Defendants on July 23, 2009. (Doc. No. 1 ("Notice of Removal").) Plaintiff asserts a claim for breach of the Employment Agreement and seeks $30,000 in severance pay.[1] (2d Amend. Compl. ¶ 15.) On August 4, 2010, Defendants filed their Answer,[2] asserting counterclaims for breach of duty of good faith and loyalty, breach of contract, and requesting a permanent injunction to prevent Plaintiff from retaining, using or disseminating confidential and proprietary information.[3] (Doc. No. 37 ¶¶ 40-64.) Plaintiff answered Defendants' counterclaims on August 30, 2010. (Doc. No. 46 ("Pl.'s Answer").) On September 22, 2010, Plaintiff moved for summary judgment on all claims and counterclaims (Doc. No. 48.), which the Court subsequently denied on February 18,

---

[1] The Employment Agreement also provided for Plaintiff's retention of "Exit Event payment rights," which would entitle Plaintiff to compensation in the event of OnBoard's acquisition, public offering, or dissolution. (Employment Agreement ¶¶ 2.15, 7.4-7.5.) However, as no such events have occurred, neither party argued the issue during the three-day bench trial conducted by the Court.

[2] Defendants' first Answer was filed on December 18, 2009. Defendants filed a number of motions in between the Notice of Removal and Defendants' first Answer: notably, a Motion to Dismiss filed on July 28, 2009.

[3] Defendants' Answer was filed prior to Plaintiff's filing of the Second Amended Complaint. As the Second Amended Complaint merely narrowed the issues before the Court, it did not require an Amended Answer on Defendants' part. *Compare* Notice of Removal (bringing forth claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation) *with* 2d Amend. Compl. (pleading only a claim for breach of contract).

2011.[4]  (Doc. No. 83.)  On June 7, 2011, a bench trial commenced, during which seven witnesses testified.  Following the trial, on June 24, 2011, the Parties each submitted Amended Proposed Findings of Fact and Conclusions of Law.  (Doc. Nos. 116 ("Pl.'s Amend. Proposed Findings") and 117 ("Defs.' Amend. Proposed Findings").)

### C.   *Factual Background*

OnBoard was founded by Defendants, Bednarsh as the President, and Siden as the Chief Operating Officer.  (Defs.' Amend. Proposed Findings 1; Doc. No. 96 ("Final Pretrial Order" or "FPO") ¶¶ 3(a)(1), 3(a)(3-4).)  Plaintiff was OnBoard's Vice President of Marketing commencing "on or about September 17, 2007," until May 5, 2009.  (FPO 3; 2d Amend. Compl. ¶ 5.)  The underlying claims and counterclaims pertain to whether Plaintiff was terminated with or without cause, resigned, or breached his duty of good faith and loyalty owed to OnBoard under the contract obligations pursuant to their Employment Agreement.

The Parties have stipulated that the Employment Agreement, properly executed on September 19, 2007, sets forth the "terms and conditions of Plaintiff's employment."  (FPO 3; *see* Employment Agreement.)  Under the terms of the Employment Agreement, Plaintiff was an "at-will" employee; thus, Defendants could fire him at any time with or without cause.  (Employment Agreement ¶ 7.)  If Plaintiff was terminated without cause, he would be entitled to: (1) severance pay in the amount of three months salary; and (2) the retention of "Exit Event Rights," which would give Plaintiff a share of the proceeds should OnBoard be sold or otherwise undergo a change in ownership (collectively "Severance Package").  (*Id.* at ¶ 7.4.)  However, if Plaintiff was "terminated for Cause" or resigned his employment, he would not be entitled to the Severance Package.

---

[4] Defendants filed a memorandum in Opposition on October 14, 2010, and Plaintiff filed a Reply Brief on October 29, 2010.

(Employment Agreement ¶¶ 7.1-7.2; Defs.' Amend. Proposed Findings 2-3; Pl.'s Amend. Proposed Findings 3.)  The Employment Agreement defines "Cause" as:

> (i)     an intentional act of fraud, embezzlement, theft or any other material violation of law that occurs during or in the course of [Plaintiff's] employment with [OnBoard]; (ii) intentional damage to [OnBoard's] assets; (iii) intentional disclosure of [OnBoard's] confidential information contrary to [OnBoard's] policies; (iv) intentional engagement in any competitive activity which would constitute a breach of [Plaintiff's] duty of loyalty or of [Plaintiff's] obligations under this Agreement; (v) willful conduct by [Plaintiff] that is demonstrably and materially injurious to [OnBoard], monetarily or otherwise. (Employment Agreement ¶ 7.6.)

The Employment Agreement provides further clarification of Cause, stating:

> For purposes of [paragraph 7.6], and [sic] act, or a failure to act, shall not be deemed willful or intentional, as those terms are defined herein, unless it is done, or omitted to be done, by [Plaintiff] in bad faith or without a reasonable belief that [Plaintiff's] action or omission was in the best interest of [OnBoard].  Failure to meet performance standards or objectives, by itself, does not constitute "Cause". (*Id.*)

While Plaintiff was employed by OnBoard, he started a personal blog, "the notorious R.O.B.,"[5] of which Defendants were aware.  (Doc. No. 111, June 7, 2011 Transcript ("June 7 Tr.") 25:1-26:22; Doc. No. 110, June 8, 2011 Transcript ("June 8 Tr.") 33:15; Pl.'s Amend. Proposed Findings 16.)  Plaintiff had a personal card for his blog ("Personal Card"),[6] which included his personal e-mail address, his website address, cellular phone number, and Twitter account information, and it did not include contact information for OnBoard.  (Pl.'s Amend. Proposed Findings 14.)  On two separate occasions, Plaintiff criticized OnBoard's clients on his blog.  (FPO 3.)  Following client complaints, Defendants asked Plaintiff to remove the critical remarks, and he

---

[5]  Plaintiff's first blog was posted on January 16, 2008, and as of the date of this opinion he continues to operate the blog.  (*See* http://www.notorious-rob.com/page/46) (last visited Sept. 27, 2011).

[6]  The Court is intentionally refraining from referring to the Personal Card as either a "business" or a "blog" card because the point is disputed by the Parties.

complied.  (June 7 Tr. 28:18-29:1.)  Plaintiff also used an OnBoard credit card on April 30, 2009 to

purchase a blog reference book.[7]  (D13 ("Defs.' Print Screen") D00187.)

In December of 2008, Plaintiff received his first and only performance review

("Performance Review"), which covered the fourth quarter of 2008.  (D29 ("Pl.'s Review").)

According to OnBoard's Employment Guidelines, the "performance evaluation program is based on

the belief that discussions with employees about their job performance provide stimulus for job

growth and career development.  Evaluations are for the purpose of identifying employees'

strengths and opportunities for improvement."  (D56 ("Employment Guidelines") D00331.)

Notably, the Performance Review complimented Plaintiff for having "shown some great leadership

and execution."  (Pl.'s Review D00132.)  It also noted, however, that Plaintiff's absences and

tardiness were more frequent than preferred, but that the tardiness had "improved slightly."  (*Id.*)

The review further documented other areas of concern, as well as, favorable comments regarding

Plaintiff's work at two different events.  (*Id.*)  The Performance Review generally concludes that

Plaintiff "continues to be a great asset to our company and while [Defendants] can be critacal [sic]

at times, [Plaintiff] seems to really understand where [Defendants] are coming from - that is a

maturity that [they] appriciate [sic] very much."  (*Id.*)  Overall, Plaintiff received a score of 3.1 out

of a possible 5.0.  (FPO 3; Pl.'s Review D00132.)

On or around March 24, 2009, Plaintiff formally requested permission from Bednarsh and

Siden to attend the Leading Real Estate Conference ("Conference") held in Scottsdale, Arizona

from March 24, 2009 through March 28, 2009.  (FPO 3.)  Plaintiff told Defendants that there would

be potential customer leads and other business opportunities for him to pursue on behalf of

OnBoard.  (Defs.' Amend. Proposed Findings 12; June 7 Tr. 81:15-82:5.)  Defendants agreed and

---

[7] Specifically, Plaintiff purchased a book written by Tessa B. Silver, entitled: Wordpress Theme Design: A Complete Guide to Creating Professional WordPress Themes.  The total purchase price, including tax and shipping, was $39.00.

financed the trip to the Conference. (Defs.' Amend. Proposed Findings 12.) Plaintiff, as well as Stacy Ret ("Ret"), OnBoard's Former Director of Events,[8] Ira Monko, an OnBoard employee, and Michael Demetriou, OnBoard's Director of Strategic Development,[9] attended the Conference. (Pl.'s Amend. Proposed Findings 14; June 8 Tr. 5:14-17.)

At the Conference, Plaintiff helped to set up OnBoard's display booth, held a video focus group, participated in sales meetings, spoke with Matthew Dollinger ("Dollinger"), the Vice President of Strategic Development at World Properties, LLC, and passed out his Personal Cards. (June 8 Tr. 19:15-21:21; Pl.'s Amend. Proposed Findings 14.) Notably, OnBoard's client, Metropolitan Regional Information Systems, Inc. ("MRIS") did not send representatives to the Conference. (Pl.'s Amend. Proposed Findings 18; Charron Deposition ("Charron Dep.") 48:12-22, Mar. 23, 2011.) Also, David Charron ("Charron"), President of MRIS, was unaware that Plaintiff was employed by OnBoard at the time of the Conference. (Id.) Plaintiff's conduct at the Conference is part of the dispute underlying Defendants' breach of duty of good faith and loyalty counterclaim. (Pl.'s Amend. Proposed Findings 12.)

On April 27, 2009, Plaintiff registered the domain name "7DSassociates.com."[10] (FPO 4.) The next day, April 28, 2009, Plaintiff and Siden met for their weekly status meeting, during which Plaintiff offered to give up his full-time position with OnBoard for a part-time position. (Id. at 3.) In response, Siden advised Plaintiff that he "need[ed]" him to remain full-time in his current position at OnBoard. (Id.)

---

[8] Ret is still employed by OnBoard as the Director of Marketing. (June 8 Tr. 114:2-5.)

[9] Prior to Michael Demetriou's current title as Director of Strategic Development, he held the positions of Relationship Specialist and National Sales Manager at OnBoard.

[10] The term 7DS stands for seven deadly sins, "like sloth, greed... lust..." and is a term that Plaintiff used on his blog when he was writing about his "theories on marketing, [and] how people do marketing." (June 7 Tr. 29:13-30:1.) As of June 9, 2011, (the last day of trial), Plaintiff owned at least six other domain names. (D8 ("GoDaddy.com Subpoena Response") GD 000002.)

On April 30, 2009, the Marketing Department, managed by Plaintiff, erroneously sent an e-mail with a client satisfaction survey to hundreds of clients in OnBoard's database. (*Id.* at 4.) Plaintiff was out of the office when the survey was e-mailed, even though the error occurred during business hours. (Pl.'s Amend. Proposed Findings 22.) At 7:47 p.m. that evening, Peter Goldey, OnBoard's Chief Information and Knowledge Officer, sent an e-mail to Plaintiff describing the error and asking Plaintiff to determine how it occurred. (Defs.' Print Screens D00246.) On May 1, 2009 at 7:31 a.m., Plaintiff sent an e-mail to Siden, Cheryl Crouse ("Crouse"), OnBoard's Human Resources Manager at the time, and two other OnBoard employees, stating: "I'm really not feeling well this morning; could barely get out of bed. Hoping it isn't the swine flu deal... I'll email later, but am probably not available." (*Id.*) At 1:23 p.m. later that day, Siden sent Plaintiff the first of two more e-mails regarding the error. (D12 ("Survey Error Emails") D00246.) He asked Plaintiff to please respond "[w]hen he is up and about." (*Id.*) Siden's second e-mail, which was sent at 3:46 p.m. the same day, implored Plaintiff to "chime in," as the error was "creating a lot of confusion." (*Id.* at D00248.) Plaintiff did not respond to any of Defendants' e-mails. (June 7 Tr. 107:10-17; June 8 Tr. 32:12-34:4.) Sometime during that same day, Plaintiff "migrated" his personal blog to a different hosting plan.[11] (June 8 Tr. 33:11-20.)

On May 4, 2009, Siden texted Plaintiff and asked him to come to his office to meet with Bednarsh and himself. (June 7 Tr. 16:11-18, June 8 Tr. 52:22-53:1.) Explaining that he was at lunch with a fellow employee, Plaintiff responded that he would report to Siden's office upon his return to OnBoard's offices. (June 7 Tr. 16:11-18.) Fifteen to thirty minutes later, at approximately 1:00 p.m., Plaintiff arrived at Siden's office. (June 7 Tr. 16:20-17:3.) Bednarsh was unavailable to

---

[11] "Migrating the blog" to a different hosting plan "involves working at a computer, which can be done at home[,]" and moving a blog from one server or software platform to another. (Pl.'s Amend. Proposed Findings 17.)

meet at that time so Siden told Plaintiff that they would meet at "the appropriate time." (June 8 Tr. 53:7-8) (*see* June 7 Tr. 17:1-25.)

On May 5, 2009, at approximately 1:00 p.m., Plaintiff, Siden and Bednarsh had their next regularly scheduled weekly status meeting ("May 5 Meeting"). (June 7 Tr. 18:1-8.) Frustrated with Plaintiff's recent job performance, Siden spoke in a raised voice. (*Id.* at 19:10-21:8.) He criticized Plaintiff's general performance and his response to the client satisfaction survey error from the previous week. (*Id.*) Bednarsh was mostly silent. (June 7 Tr. 19:10-13.) At some point during the May 5 Meeting, Plaintiff's employment at OnBoard ended.[12] However, before the May 5 Meeting concluded, the Parties planned to reconvene the next day at OnBoard's offices to discuss how to present Plaintiff's departure to the employees and transition Plaintiff's responsibilities.[13] (Pl.'s Amend. Proposed Findings 5; Defs.' Amend. Proposed Findings 7.)

After the May 5 Meeting ended, Plaintiff emailed his coworkers stating that he had to leave work due to a family emergency. (D44 D00190.) Plaintiff then left the office on his own accord, with his OnBoard laptop, but without any of his personal belongings. (Doc. No. 111, June 7 Tr.

---

[12] Notably, OnBoard's employee termination procedure was not implemented on May 5, 2009. OnBoard's standard procedure requires that a termination be preceded by the employee's manager notifying the Human Resources Manager, who then drafts a termination memorandum. (June 9, 2011 Transcript ("June 9 Tr.") 6:2-4.) Next, the Human Resources Manager contacts the IT Department and informs it of the exact time that the termination is set to occur. (*Id.* at 6:4-7.) Finally, a meeting is held with the employee to be terminated, his or her manager, and the Human Resources Manager, during which the employee is presented with the termination memorandum. (*Id.* at 7:1-6.) During the meeting, the IT Department locks the terminated employee out of all OnBoard systems. After the meeting, the Human Resources Manager escorts the terminated employee to collect his or her personal items. (*Id.* at 8:24-9:7.) The employee is required to return his or her ID card/pass, company property, credit cards, and any other OnBoard property, and then, finally, is escorted by the Human Resources Manager out of the office. (*Id.*) Though there is no strict procedure for resignation, the OnBoard Employee Guidelines states that "[r]esignations should normally be in writing addressed to the Owners." (Employment Guidelines D00331.)

[13] This is where the Parties' assessment of the facts diverges. As the end of Hahn's employment is the central dispute in this litigation, the Court must determine whether Plaintiff proved that he was terminated without cause during the May 5 Meeting, as he contends, or whether he resigned or was otherwise terminated for cause, which is discussed *infra* under Section IIIA.

35:16-25.) He was neither asked nor volunteered to return his OnBoard credit card, ID Card/Pass nor any other OnBoard property. (*Id.* at 131:4-11.) At 2:34 a.m. the next morning, Plaintiff sent Siden and Bednarsh an e-mail, stating that he needed an additional day to consider his options because he had not had a chance to consult with his family. (D44 ("Post Meeting Email Exchanges") D00191.) Later that morning at 10:03 a.m., Siden responded that it was necessary to resolve the end of Hahn's employment with OnBoard in an expeditious manner, characterizing Plaintiff's absence as "disruptive." (D20 ("Cover Story Email") D00251.) Siden also informed Plaintiff that the day would be treated as an unpaid personal day. (*Id.*) That evening, Siden also sent a series of internal e-mails, which included instructions to the appropriate departments to terminate Plaintiff's access to his OnBoard e-mail and Active Directory accounts. (D40 D00174; D44 D00188-D00191; D54 D00321.)

On May 6, 2011, Plaintiff eventually responded to Siden's e-mail, asserting that Siden and Bednarsh terminated him after he was asked to resign and refused. Plaintiff also noted in the same e-mail that any effort to describe his behavior as "disruptive" was merely an attempt to create a "false record." (D40 D00174.) On May 7, 2009, Defendants circulated an e-mail to OnBoard employees stating that Plaintiff had resigned. (D54 D00320). Plaintiff was not consulted about the e-mail nor did he approve of it. (Pl.'s Amend. Proposed Findings 7; June 7 Tr. 39:23-40:10.) Thereafter, on May 11, 2009, Crouse filled out a State Unemployment Insurance Service Employee Separation Record, indicating that the reason for Hahn's separation was voluntary and for personal reasons. (D55 ("Employee Separation Record"); Pl.'s Amend. Proposed Findings 8.) The Employee Separation Record was completed at Bednarsh's instruction and without consulting Plaintiff. (Pl.'s Amend. Proposed Findings 8.)

Notably, on the same day that Hahn's employment with OnBoard ended, Plaintiff at some point changed the domain name server for 7DSassociates.com. (GoDaddy.com Subpoena

Response; GD 000017.)  On May 6, 2009, Plaintiff registered a new business, 7DS Associates, LLC ("7DS Associates"), in the state of New Jersey,[14] for the purpose of providing strategic consultant services to businesses.  (June 7 Tr. 123:4-16.)

In a letter dated December 15, 2009, MRIS notified Defendants that it was terminating the agreement between the two companies.  Commencing in December 2009, Plaintiff began to provide OnBoard's former client, MRIS, with consulting services.  (June 8 Tr. 112:11-113:6; Pl.'s Amend. Proposed Findings 18.)  MRIS was an OnBoard client for at least a part of the period of Plaintiff's employment at OnBoard.  (Defs.' Amend. Proposed Findings 20.)  Plaintiff's service to MRIS was limited to "long term" strategic planning, and Plaintiff was eventually employed by MRIS from January 2010 until May 2010.  (June 8 Tr. 112:24-113:3; Defs.' Amend. Proposed Findings 21.) The aforementioned events are the basis for Defendants' counterclaims.


## II.   CHOICE OF LAW & STANDARD OF REVIEW

### A.   *New York State Law Applies*

When exercising diversity jurisdiction, a federal court must "apply the substantive law of the state in which the forum is located, including the applicable choice of law principles."  *Pepe v. Rival Co.*, 85 F. Supp. 2d 349, 380 (D.N.J. 1999), *aff'd* 254 F.3d 1078 (3d Cir. 2001) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), cert. denied, 316 U.S. 685 (1942); *Robeson Indus. Corp. v. Hartford Accident & Indem. Co.*, 178 F.3d 160, 164 (3d Cir. 1999); *Nat. Util. Serv., Inc. v. Chesapeake Corp.*, 45 F. Supp. 2d 438, 446 (D.N.J. 1999)).  New Jersey's choice of law analysis requires application of the substantive law of the "jurisdiction with the most significant relationship and closest contacts with the transaction and the parties."  *Id.*  When determining which

---

[14] The Court considers the May 6, 2009 receipt provided by the New Jersey Department of Treasury, Division of Revenue, to be a true and accurate reflection of the actual date on which 7DS was registered as a limited liability company.  (*See* D27 ("Certification of Formation").)

state law applies to a contract dispute, courts in New Jersey have looked to the Restatement (Second) of Conflicts of Law.  *Id.*; *see also Keil v. Nat. Westminster Bank, Inc.*, 311 N.J. Super. 473, 485 (App. Div. 1998.)  OnBoard is incorporated and located in New York, and Plaintiff's services were rendered in New York, under the relevant sections of the Restatement, the Court has determined that the law of New York shall apply.  *See* Restatement (Second) of Conflicts of Law §§ 6, 188 (1969).

### B. *Preponderance of the Evidence*

Under New York law, the party asserting a civil claim bears the burden of proving that claim "by a fair preponderance of the evidence." *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994); *see also ROI, Inc. v. Hidden Valley Realty Corp.*, 845 N.Y.S.2d 848, 850 (N.Y. App. Div. 2007) (internal citations omitted); *Theodore Barry & Assoc. v. State Ct. of Claims of N.Y.*, 587 N.Y.S.2d 481, 484 (N.Y. Ct. Cl. 1992) ("It is hornbook law that the claimant in a contract action must prove by a preponderance of the evidence that the defendant breached provisions of the Employment Agreement.").  To satisfy this burden, "'the evidence must be of such weight as to provide a reasonable belief in the truth of the facts asserted' (Fisch, New York Evidence [2d ed], § 1990)." *Jarrett v. Madifari*, 67 A.D.2d 396, 404 (N.Y. App. Div. 1979); *see also* 58A N.Y. Jur. 2d Evid. and Witnesses § 968 (2011) ("The party having the burden of proof must prove all contentions by the greater weight of evidence.").  Furthermore, when "the evidence as a matter of logical necessity is equally balanced, the plaintiff has failed to meet his burden, and the cause of action is not made out." *Rinaldi & Sons, Inc. v. Wells Fargo Alarm Serv., Inc.*, 39 N.Y.2d 191, 196 (N.Y. App. Ct. 1976); *318 East 93, LLC v. Ward*, 713 N.Y.S.2d 860, 860 (N.Y. App. Div. 2000) (citing *D'Amico v. Mfr's Hanover Trust Co.*, 569 N.Y.S.2d 962, 964 (App. Div. 1991)) ("When the trial evidence weighs so evenly as not to preponderate on either side, the court must decide against the party with the burden.").

### III.  **LEGAL DISCUSSION**

The Court will now address the three claims, specifically: (1) Plaintiff's breach of contract claim; (2) Defendants' breach of contract counterclaim;[15] and (3) Defendants' counterclaim seeking a permanent injunction.  Defendants also requested, that in the event the Court found in its favor on its counterclaims, that Defendants be granted an award of attorneys' fees and costs.  (Defs.' Answer ¶ 64(a).)  In addition, at trial, Defendants preserved the right to file a motion for excessive costs.  (Doc. No. 112, June 9, 2011 Transcript ("June 9 Tr.") 49:22-50:8.)   The Parties' claims will be addressed in turn.

### A.  ***Plaintiff's Breach of Contract Claim***

#### 1.  ***Legal Standard***

Plaintiff asserts that Defendants breached the Employment Agreement by failing to pay him the Severance Package as set forth in the contract.  To prove breach of a contract under New York law, the party asserting the claim must establish: (1) the existence of a contract; (2) performance of the contract by the party asserting a breach; (3) failure to perform by the party allegedly in breach; and (4) resulting damages from the breach.  *See Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011); *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000); *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996), *aff'd* 108 F.3d 1369 (2d Cir. 1997).

---

[15] Defendants' breach of the duty of good faith and loyalty claims are based on the same set of facts and, as such, are duplicative of its breach of contract claim.  *See R.I. Island House, LLC v. N. Town Phase II Houses, Inc.*, 51 A.D.3d 890, 896 (N.Y. App. Div. 2008) ("The causes of action alleging breach of the covenant of good faith . . . implied in every contract, [is] duplicative of the breach of contract cause[] of action."); *Logan Advisors, LLC v. Patriarch Partners, LLC*, 63 A.D.3d 440, 443 (N.Y. App. Div. 2009) (upholding the dismissal of a claim for breach of good faith and fair dealing, because it was duplicative to the party's breach of contract claim, which arose from the same set of facts and allegations).  Accordingly, the Court will address these two counterclaims as a single counterclaim for breach of contract.

The key element of a breach of contract claim is whether the party allegedly in violation of the contract actually breached its obligations. *R.H. Damon & Co. v. Softkey Software Prod., Inc.*, 811 F. Supp. 986, 991 (S.D.N.Y. 1993). Under the Employment Agreement, when Plaintiff's employment with OnBoard ended, OnBoard was obligated to give Plaintiff his Severance Package only if he was terminated without cause. (Employment Agreement ¶¶ 7.1-7.6.) Accordingly, in this matter, termination without cause operates as a condition precedent to Defendants' contractual obligation to vest Plaintiff with the Severance Package. *Klewin Bldg. Co., Inc. v. Heritage Plumbing & Heating, Inc.*, 42 A.D.3d 559, 560 (N.Y. App. Div. 2007) (internal quotations omitted) ("A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises."); *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1099 (2d Cir. 1992) (citation omitted) (applying New York law and noting that "a 'condition' is 'an event that must occur *before* performance of a contractual duty becomes due'") (emphasis in original). Failure to prove by a preponderance of the evidence that Plaintiff was terminated without cause, requires a finding that Defendants did not breach the Agreement. *Navilia v. Windsor Wolf Rd. Props. Co.*, 249 A.D.2d 658, 659 (N.Y. App. Div. 1998) ("It is well settled that no action for breach of contract lies where the party seeking to enforce the contract has failed to perform a specified condition precedent."); *See Grin v. 345 E. 56th St. Owners, Inc.*, 212 A.D.2d 504 (N.Y. App. Div. 1995) (dismissing a breach of contract claim, where the sale of a property at a public auction was conditioned on receipt of an initial payment within a certain timeframe, which plaintiff failed to satisfy).

## 2. *Legal Arguments*

In this matter, Plaintiff alleges that Defendants breached the Employment Agreement by withholding the Severance Package. (2d Amend. Compl. ¶¶ 16-17.) Plaintiff contends that during the May 5 Meeting, he was terminated without cause. (*Id.* at ¶¶ 13-14.) Siden purportedly pushed a

pad of paper toward Plaintiff and demanded his resignation. (June 7 Tr. 20:13-17.) Plaintiff testified that Siden then told him to resign or that he would otherwise be terminated for cause. (June 7 Tr. 21:12-15.) Plaintiff insists that no such resignation was ever tendered. (June 7 Tr. 32: 16-19.) Plaintiff asserts that his offer to modify his relationship with Defendants was made in consideration of OnBoard's best financial interest. (*See* June 7 Tr. 12:11-19.) Plaintiff testified that as a family man with two children, he had no motive to resign and forfeit his Severance Package, unlike Defendants, who had motive to avoid payment of the Severance Package. (Pl.'s Amend. Proposed Findings 8-9.)

Furthermore, Plaintiff argues that his Performance Review supports his assertion that he satisfactorily performed under the terms of the Employment Agreement, and as such, he did not breach the contract. (Pl.'s Amend. Proposed Findings 2; *see also* Pl.'s Review D00132.) While Plaintiff did not dispute that he was repeatedly tardy and occasionally absent, he asserts that OnBoard did not treat his tardiness or absences as a serious issue, nor did such occurrences result in Plaintiff missing any deadlines. (*Id.* at 8; June 7 Tr. 44:1-19.) Plaintiff further argues that Defendants did not prove that he had the requisite intent necessary to meet the definition of "Cause," as it is defined in the Employment Agreement.[16]

Conversely, Defendants assert that Plaintiff resigned during the May 5 Meeting. Siden and Bednarsh both testified that during the meeting Plaintiff conceded that he was not behind OnBoard's new revenue plans, and that his "head wasn't in it" anymore. (June 8 Tr. 38:10-12; 67:11-13; 67:13-14; 67:21-22.) Then, after announcing his resignation, Plaintiff asked them to

---

[16] The Agreement provides further clarification of Cause, stating:

> For purposes of [paragraph 7.6], and [sic] act, or a failure to act, shall not be deemed willful or intentional, as those terms are defined herein, unless it is done, or omitted to be done, by [Plaintiff] in bad faith or without a reasonable belief that [Plaintiff's] action or omission was in the best interest of [OnBoard]. Failure to meet performance standards or objectives, by itself, does not constitute "Cause". (Agreement ¶ 7.6.)

position his resignation as a layoff so that he could collect unemployment benefits. (June 8 Tr. 38:23-39:3.) Siden and Bednarsh testified that they told Plaintiff that they would consider his request to see if they could accommodate it, but made no commitment. (June 8 Tr. 39:4-6.) Siden and Bednarsh also each testified that during the May 5 Meeting, Plaintiff stated that he knew he was not entitled to any severance. (June 8 Tr. 39:8-10; 68:4-6.) In addition, Defendants claim that as early as the Conference, Plaintiff was making plans to resign from his position at OnBoard, and that offering to work part-time was part of Plaintiff's plan to set up his own business. (FPO 9; June 8 Tr. 28:11-16.) Defendants further argue their position that Hahn resigned is supported by the fact that OnBoard's termination procedures were not used, and Plaintiff registered 7DSassociates.com prior to the end of his employment at OnBoard. (FPO 11, 13-14.)

In the alternative, Defendants argue that Plaintiff breached the Employment Agreement, and thus, could have been terminated for cause. They assert that Plaintiff caused intentional damage to the company by using its time and resources to set up 7DS Associates while still employed by OnBoard and by engaging in competitive activity. (Defs.' Amend. Proposed Findings 4-5.) Defendants further argue that Plaintiff's criticism of OnBoard clients on his blog, his unauthorized use of an OnBoard credit card to purchase a blog reference book, and his use of paid sick days to work on his blog, prove that Plaintiff breached the Employment Agreement, and thus, Plaintiff is not entitled to the Severance Package. (*Id.* at 14.) Finally, Defendants contend that Plaintiff's promotion of his blog and 7DS Associates, instead of OnBoard, at the Conference was, in and of itself, cause for termination. (*Id.* at 13-14.)

### 3.   *Analysis*

For Plaintiff to prevail on his claim, he must specifically establish (1) the existence of an employment contract; (2) that he satisfied his contractual obligations; (3) that Defendants failed to perform their contractual obligations by withholding the Severance Package; and (4) that he suffered

damages as a result of Defendants' failure to perform. *See Fischer*, 632 F.3d at 799. As to the first element of a breach of contract claim, the Parties have stipulated that "[t]he terms and conditions of [Plaintiff's] employment by OnBoard were set forth in" the Employment Agreement. (FPO 3.) Thus, the Court finds that Plaintiff has satisfied the first element of the breach of contract claim.

After careful review and consideration of whether Plaintiff performed and fulfilled his contractual obligations under the Employment Agreement, the Court finds that Plaintiff's assertion that his performance was satisfactory is well supported by the Performance Review and the overall record. Plaintiff's contention is not undermined by the inclusion of criticism in the Performance Review, as it accords with OnBoard's stated purpose for using performance reviews to evaluate employees.[17] Indeed, the overall tone of the evaluation was complimentary.

While Defendants have highlighted shortcomings in Plaintiff's performance leading up to the May 5 Meeting, the Court is not persuaded that these shortcomings are sufficient to support a finding that Plaintiff failed to perform. The Employment Agreement states that "[f]ailure to meet performance standards or objectives, by itself, does not constitute 'Cause,'" therefore, the Court is skeptical of Defendants' assertion that Plaintiff's performance review supports a finding that Plaintiff breached the Employment Agreement. (Employment Agreement ¶ 7.6.)

Similarly, Plaintiff's argument regarding Defendants' failure to establish that he had the requisite intention to meet the definition of "Cause," for purposes of termination under the Employment Agreement, is also flawed. Plaintiff, not Defendants, bears the burden under the preponderance of evidence standard. *Boyden World Corp.*, 862 F. Supp. at 1195. Regardless, the Court finds that Plaintiff's actions were in accord with his contractual obligations, and were not undertaken or performed with willful intent to cause harm to OnBoard, which is a requisite element

---

[17] "[OnBoard's] performance evaluation program is based on the belief that discussions with employees about their job performance provide stimulus for job growth and career development. Evaluations are for the purpose of identifying employees' strengths and opportunities for improvement." (Employee Guidelines D00331.)

for finding that an employee was terminated with cause under the Employment Agreement. (Employment Agreement ¶ 7.6.)  The Court is most persuaded by Siden's own testimony that on April 28, 2009, he told Plaintiff that he "need[ed]" him to remain in his position full-time.  (FPO 3; June 8 Tr. 28:23-25.)  Such a statement strongly supports a finding that Plaintiff performed his contractual obligations.  Furthermore, despite Defendants' present complaints of Hahn's failure to perform, Defendants never took action to terminate Plaintiff when the alleged misconduct occurred. Defendants argue that Plaintiff resigned and state, as an afterthought, that they could have fired Hahn for cause, thereby making their argument unpersuasive.  The Court finds that Plaintiff has established that he fully performed his contractual obligations by a preponderance of the evidence, thus satisfying the second element of a breach of contract claim.

To succeed as to the third element of a breach of contract claim, Plaintiff must first demonstrate by a preponderance of the evidence that he was terminated without cause, which would trigger his entitlement to the Severance Package.  Plaintiff attempts to prove this largely by arguing that he did not resign, and that based on his Performance Review and Defendants' knowledge and acceptance of his blog, he could not have been terminated for cause.

As Plaintiff and Defendants have presented differing accounts of how Hahn's employment ended, and neither is more credible than the other, Plaintiff has failed to meet his burden of proving by a preponderance of the evidence that he was terminated without cause.  While it does not appear Plaintiff was terminated with cause, it is unclear, based on the evidence and record adduced at trial, whether he was terminated or whether he effectively resigned.  Again, more than divergent accounts are necessary for Plaintiff to satisfy his burden of proof and establish that he was terminated without cause. *See e.g. Rinaldi & Sons, Inc.*, 39 N.Y.2d at 196 (citing *Ford v. McAdoo*, 231 N.Y. 155, 160-61 (1921)); *Matter of Erin Wine & Liquor Store, Inc. v. O'Connell*, 128 N.Y.S.2d 364, 367 (N.Y. App. Div. 1954) (internal citations omitted); *D'Amico*, 569 N.Y.S.2d at 964.  Here, the evidence as

17

a matter of logical necessity is equally balanced. Additionally, the Parties' conflicting oral testimonies are unsupported by direct or objective evidence.

Similarly, a weighing of the circumstantial evidence results in a stalemate. Plaintiff's argument that he was terminated without cause was seriously damaged by Crouse's testimony that in the three years she was employed by OnBoard, the termination procedure was followed for each of the ten employees terminated during that period, yet it was not used on May 5, 2009 with Plaintiff.[18] Indeed, the fact that Siden and Bednarsh only cut off Hahn's access to his OnBoard e-mail account after Plaintiff failed to meet with them the following day, implies that Defendants were trying to work with Hahn to make his transition smooth and amicable, which further indicates that Defendants did not terminate him. (*See* June 9 Tr. 10:9-11:12.)

Yet, the lack of documentary support for Defendants' contention that Plaintiff resigned is equally harmful. In fact, Defendants' own Employee Guidelines state that "resignations should normally be in writing addressed to the Owners." (Employee Guidelines D00331.) Moreover, while an e-mail was circulated to OnBoard's employees announcing Plaintiff's resignation, Plaintiff was not consulted about the e-mail, nor did he approve it. Similarly, Plaintiff was not consulted about the Employee Separation Record, which indicated that the reason for separation was "Voluntary: Personal Reasons." (June 9 Tr. 16:25-17:4; D55.) While Defendants highlighted that their termination procedure was not used, there is no physical evidence that Plaintiff resigned.

The Court finds that Plaintiff has not established that he was terminated without cause, a condition precedent to Defendants' duty to vest him with the Severance Package. Where the parties' accounts are equally probable, the preponderance standard requires that Plaintiff's claim

---

[18] Although Crouse testified that she did not attend one of the terminations because she was out of the country, she did prepare the relevant documents. The Court does not find that this technicality undermines the strength of Crouse's testimony, which supports the testimony that OnBoard had a strict employee termination policy, which it routinely followed in cases of employee termination.

must fail. *318 East 93*, 713 N.Y.S.2d at 860 (citing *D'Amico*, 569 N.Y.S.2d at 964). Thus, the Court finds that because Defendants' duty to perform was never triggered, they did not breach the Employment Agreement. *See Navilia*, 249 A.D.2d 658; *Grin*, 212 A.D.2d at 504. As failure of any element of a breach of contract claim is fatal, the Court need not address the fourth element regarding damages, and finds that Plaintiff has failed to sustain his burden of proving a breach of contract claim.

### B.   Defendants' Breach of Contract Counterclaim

#### 1.   Legal Standard

Defendants' breach of contract counterclaim is governed by the same four-part standard as previously set forth by the Court. *See supra* Section III.A.1. According to Defendants, Hahn breached his duty of good faith and loyalty, which relates to the third element of a breach of contract claim, or failure to perform.

The duty of good faith and loyalty creates an affirmative duty requiring an employee to act in his or her employer's best interests at all times. *Mar. Fish Prods., Inc. v. World-Wide Fish Prods. Inc.*, 100 A.D.2d 81, 89 (N.Y. App. Div. 1984); *Butler, Fitzgerald & Potter v. Beggans*, No. 93-2588, 1994 WL 463966, at *2 (S.D.N.Y. Aug. 23, 1994) (noting that "an employee is prohibited from acting in a manner 'which is inconsistent with his . . . agency or trust . . . .'" (internal citation omitted)). For instance, if an employee uses an employer's resources to create a competitive business or acts in a manner to compete with the business to use such resources, the duty of good faith and loyalty has been breached. *See Mar. Fish Prods., Inc.*, 100 A.D.2d at 88 (finding that an employee "may secretly incorporate a competitive business prior to his departure" as long as he is not "us[ing] his [employer's] time, facilities or proprietary secrets to build the competing business"); *Fada Int'l Corp. v. Cheung*, 870 N.Y.S.2d 23, 24 (N.Y. App. Div. 2008) (finding a "cause of action, for breach of the

duty of loyalty, was . . . properly dismissed since there is no claim that defendants used plaintiff's time, facilities or proprietary secrets in setting up their new business.").

Likewise, an employee can breach his duty of good faith and loyalty to an employer by lessening the amount of work that he or she performs on behalf of the employer during the term of employment, or by otherwise failing to comply with the obligations and responsibilities set forth in an employment contract. *See Great Am. Trucking Co. v. Swiech*, 700 N.Y.S.2d 632, 633 (N.Y. App. Div. 1999) (denying employer's summary judgment motion, because whether an employee breached the duty of loyalty by lessening his work or misappropriating business secrets for personal, beneficial use is a triable issue of fact.); *Feiger v. Iral Jewelry, Ltd.*, 394 N.Y.S.2d 626, 626-27 (N.Y. App. Div. 1977) (finding that a plaintiff who plans and takes "preliminary steps to enter into a competitive business . . ." does not breach his duty of fidelity so long as the Court finds that "plaintiff never lessened his work on behalf of defendant and never misappropriated to his own use any business secrets or special knowledge.").

Finally, the misappropriation of information or solicitation of clients may also lead to a finding that an employee has breached the duty of good faith and loyalty. *E.g., Butler, Fitzgerald & Potter*, 1994 WL 463966, at *3 ("When an employee has conspired to take clients away from his employer, and when the former client accepts the proposal, the employee has breached his duty of loyalty."); *A & L Scientific Corp. v. Latmore*, 696 N.Y.S.2d 495, 495 (N.Y. App. Div. 1999) ("Solicitation of an employer's clients, even if the solicitation is unsuccessful, may constitute a breach of the duty of loyalty.)  Generally speaking, however, unless an employment agreement includes a binding non-compete provision, "an employee may solicit an employer's customers . . . when the employment relationship has been terminated." *See Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 86 (2d Cir. 2010) ("This duty of the seller not to solicit customers does not, however, include an obligation not to accept such of his former customers as may choose to follow him to his new

20

employment."); *Catalogue Serv. of Westchester, Inc. v. Wise*, 405 N.Y.S.2d 723, 724 (N.Y. App. Div. 1978).

When assessing whether the doctrine has been breached, the date and time period that the competitive business was created or when the competitive conduct commenced is particularly important to the Court's analysis. *See A & L Scientific Corp.*, 696 N.Y.S.2d at 496 (distinguishing between an employee's formation of a competitive corporation while still employed and actual operation of a competitive corporation, and finding that the former does not constitute breach of the duty of loyalty whereas the latter does). Further, it is noteworthy to point out that even if an employment contract fails to set forth a duty of good faith and loyalty clause, such provisions are implicit even in the absence of an express provision. *DDS Partners, LLC v. Celenza*, 16 A.D.3d 114, 115 (N.Y. App. Div. 2005) (noting that every employment contract imposes a duty of good faith and loyalty, even in the absence of an express provision creating such a duty).

### 2. *Legal Arguments*

Defendants allege that Plaintiff breached the implied duty of good faith and loyalty by engaging in competitive activity, using company time and resources for 7DS Associates, and by soliciting an OnBoard client. Defendants assert that because 7DS Associates and OnBoard are both in the business of consulting,[19] the two companies are in direct competition. (Defs.' Amend. Proposed Findings 5.) They also contend that Plaintiff's use of a paid sick day on May 1, 2009, to work on his blog, as well as his unauthorized use of an OnBoard credit card to purchase a blog reference book, were improper uses of OnBoard's resources, which constitutes a breach of the Employment Agreement. (Defs.' Amend. Proposed Findings 17.) As to the Conference, Defendants argue that Plaintiff's failure to represent OnBoard in any meaningful way was a breach of the duty of good faith

---

[19] "OnBoard provides technology, information, and related services to companies in real estate, publishing, marketing and financial services." (FPO 2.) Siden testified that "contrary to [Plaintiff's] testimony," OnBoard does provide consulting services. (June 8 Tr. 26:1-4.)

and that Plaintiff's promotion of 7DS Associates and his distribution of his Personal Card, which Defendants contend was a business card, similarly was a breach of the duty of loyalty. Finally, Defendants assert that Plaintiff solicited MRIS at the Conference, which ultimately led MRIS to refuse to renew its contract with OnBoard, and Plaintiff's employment with MRIS. (*Id.* at 21.)

However, Plaintiff contends that his blog was a "very popular marketing tool" that frequently praised OnBoard. (June 7 Tr. 26:5-27:22.) Plaintiff also asserts that he never had any contact with MRIS during his employment with OnBoard, including at the Conference. (June 7 Tr. 108:2-7; Pl.'s Amend. Proposed Findings 18.) Similarly, Hahn contends that as of May 6, 2009, nothing had been posted to 7DSassociates.com, and that he did not pitch 7DS Associates to anyone while he was employed by OnBoard. (June 7 Tr. 42:19-43:5.) In support of his assertion that he neither solicited business nor promoted 7DS Associates at the Conference, Plaintiff contends that the Personal Card was a "blog card," not a business card, as it "does not include the name of any business entity and is not a business card in the ordinary and usual understanding of the term 'business card.'" (Pl.'s Amend. Proposed Findings 14; *see* June 7 Tr. 88:10 (describing the Personal Card as "sort of a personal calling card"), 127:8-128:3.) Plaintiff testified that 7DS Associates' principal area of business is real estate consulting, whereas OnBoard is "a data provider, they sell data and software products through real estate companies." (June 7 Tr. 123:4-10.) Accordingly, Plaintiff asserts that 7DS Associates and OnBoard are not in direct competition. (June 7 Tr: 123:11-16.)

### 3. *Analysis*

As previously discussed, the Parties stipulated that the Employment Agreement governs the terms and conditions of Plaintiff's employment at OnBoard. Accordingly, the Court finds that Defendants have satisfied the first element of a breach of contract claim. In addition, Plaintiff does not assert that Defendants failed to perform in any regard other than withholding the Severance Package. However, the Court has already determined that Defendants did not breach the

Employment Agreement with regard to the Severance Package. Therefore, the Court finds that Defendants have established the second element, specifically, that they performed their contractual obligations. *See Spherenomics Global Contact Ctrs. v. vCustomer Corp.*, 427 F. Supp.2d 236, 247 (E.D.N.Y. 2006).

To satisfy the third element, Defendants must prove that Plaintiff breached the implied duty of good faith and fair dealing. Specifically, Defendants must establish by a preponderance of the evidence that Plaintiff's alleged conduct of (1) registering 7DS Associates, a competing business, while still employed by Defendants; (2) using company time and resources at the Conference to promote his personal blog and gather clients for his new business; and/or (3) soliciting OnBoard's client, MRIS, for 7DS Associates, while still employed by OnBoard, constitutes a breach of Hahn's duty of good faith and/or loyalty to OnBoard.

Regarding 7DS Associates, although Hahn created and incorporated this competing corporation while still employed by Defendants, the Court finds Plaintiff's account of the origination of the term 7DS, and his subsequent decision to register the domain name, credible and not a breach of the Employment Agreement. Indeed, the creation of a competitive business does not conclusively establish a breach of good faith and loyalty. *See Mar. Fish Prods., Inc.*, 100 A.D.2d at 88. Further, while Plaintiff did register the domain name 7DSassociates.com while still employed by Defendants, he did not upload any publicly accessible content during his employment. (D8 GoDaddy.com Subpoena Response; GD 000002; GD 000017.) Even if Plaintiff did intend to use 7DSassociates.com to incorporate a competitive business, Defendants have not produced any evidence that persuades the Court that Plaintiff used OnBoard's "time, facilities or proprietary secrets" to build 7DS Associates. *See Fada Int'l Corp.*, 870 N.Y.S.2d at 24.

The Court is further persuaded that Plaintiff's conduct with regard to 7DS Associates did not constitute a breach of his duty of good faith and loyalty because he did not register the limited

23

liability corporation until May 6, 2009, the day after Plaintiff's employment ended. *See A & L Scientific Corp.*, 696 N.Y.S.2d at 496. Notably, the Employment Agreement does not contain any post-employment covenant, such as an anti-compete clause. (*See* Employment Agreement.) In addition, while Plaintiff may have inappropriately used an OnBoard credit card to purchase a reference book for his personal blog, the Court is persuaded by the evidence adduced at trial that Plaintiff used his blog with Defendants' knowledge and consent, to fulfill part of his professional obligations to OnBoard. (June 7 Tr. 25:20-27:5.) Thus, the Court finds that Defendants have not established by a preponderance of the evidence that OnBoard's time, facilities, or resources were used to register 7DS Associates as a corporation, and as such, the conduct does not constitute a breach of Plaintiff's duty of good faith and loyalty.

Next, the Court finds that Defendants have failed to demonstrate by a preponderance of the evidence that OnBoard lost business opportunities at the Conference because Plaintiff advertised and promoted his new business and personal blog, instead of promoting OnBoard. At the Conference, Plaintiff helped set up OnBoard's display booth, held a video focus group, and participated in sales meetings. (Pl.'s Amend. Proposed Findings 14.) Indeed, Dollinger testified that Plaintiff gave him an OnBoard sales pitch and business card, specifically noting that Plaintiff did not pitch any competing product or business. (Pl.'s Amend. Proposed Findings 14, 16.) While Plaintiff did distribute his Personal Cards during the conference, the Court finds that Defendants' pre-existing knowledge and lack of objection to Plaintiff having a blog is particularly damaging to their claim. *See Butler, Fitzgerald & Potter*, 1994 WL 463966, at *2. Accordingly, the Court is persuaded that Plaintiff's conduct was in furtherance of his professional obligations to OnBoard and finds that Defendants have not established by a preponderance of the evidence that Plaintiff failed to adequately represent and/or promote OnBoard at the Conference, as to constitute a breach of his duty of good faith and loyalty. (Pl.'s Amend. Proposed Findings 15-17.)

Finally, the Court finds that Defendants' claim that Plaintiff also breached his duty of good faith and loyalty by soliciting its client, MRIS, while still employed by OnBoard, also fails. As explained above, an employee may not solicit an employer's client until after he or she has been terminated or an employment term has naturally ended. *See, e.g., A & L Scientific Corp.*, 696 N.Y.S.2d at 495; *Catalogue Serv. of Westchester*, 405 N.Y.S.2d at 724. Although Defendants allege that Plaintiff solicited MRIS at the Conference, the Court finds that Charron's contrary deposition testimony is highly persuasive. Specifically, Charron testified that MRIS did not send any representatives to the Conference and that he was not in contact with Plaintiff until their first meeting in the summer of 2009. (Pl.'s Amend. Proposed Findings 18; D75; Charron Dep. 48:12-22; 30:6-21; 33:21-23.) Defendants do not allege that Plaintiff took any other specific action or measures to solicit MRIS or any other OnBoard client. Accordingly, the Court finds that Charron's deposition testimony is fatal to Defendants' solicitation claim. (Pl.'s Amend. Proposed Findings 19.) Indeed, Plaintiff was not duty-bound to reject a client after his termination with OnBoard on the mere basis that the client was a former OnBoard client. *See Bessemer Trust Co., N.A.*, 618 F.3d at 86. Plaintiff did not become a consultant for MRIS until December 2009, and because there is no post-employment restrictive covenant in the Employment Agreement, the Court need not consider Plaintiff's post-employment conduct. (June 8 Tr. 112:11-113:6; Pl.'s Amend. Proposed Findings 18.) Thus, the Court finds that Defendants have not proven by a preponderance of the evidence that Plaintiff solicited OnBoard's clients while still employed by the company. As Defendants have failed to establish that Plaintiff breached the contract, the Court need not address whether Defendants are entitled to damages.

### C.   *Defendants' Request for a Permanent Injunction*

#### 1.   *Legal Standard*

The party seeking imposition of a permanent injunction must show: "(1) that irreparable injury will result if the injunction is not granted; (2) that other remedies are inadequate; and (3) that a balancing of the equities favors the applicant." *A & G Research, Inc. v. GC Metrics, Inc.*, No. 07-5870, 2008 WL 2150110, at *13 (N.Y. Sup. Ct. May 21, 2008) (internal citations omitted). Further, such relief is germane "only where the right to such relief is clear and where the plaintiff has made a strong case for such relief; injunctive relief should be denied in doubtful cases." *Id.* Possession of the confidential information alone is insufficient to prove that an employee actually used the documents for his or her personal benefit. *NCN Co. Inc. v. Cavanagh*, 215 A.D.2d 737 (N.Y. App. Div. 1995) (refusing to grant a preliminary or permanent injunction where the plaintiff failed to establish that the defendants were utilizing protected proprietary information or that the defendants had appropriated the plaintiff's property or copied the plaintiff's customer lists).

#### 2.   *Legal Arguments*

OnBoard provided Plaintiff with a company-owned laptop.  (Defs.' Amend. Proposed Findings 8; Employment Guidelines 9.)  However, Plaintiff often used his personal computer instead, and in so doing, uploaded OnBoard files and documents onto his hard drive.  (Pl.'s Amend. Proposed Findings 25.)  Defendants thus allege that Plaintiff removed and appropriated OnBoard's confidential and proprietary information without authorization during the course of his employment, causing Defendants to file a motion to seek a permanent injunction to bar Plaintiff from using or disseminating the information.  (Defs.' Amend. Proposed Findings 22, 28; June 8 Tr. 81:21-82:18.)  Defendants contend that, during the course of his employment, Plaintiff removed OnBoard's documents from its offices, and retained the documents for at least two years following the end of his employment.  (Defs.' Amend. Proposed Findings 22, 28; June 8 Tr. 82:2-18.)  They further

allege that Plaintiff used these files to advance 7DS Associates. (Defs.' Answer ¶ 60; Defs.' Amend. Proposed Findings 14.)

Notably, on May 20, 2011, Plaintiff asserts that he had the contents of his hard drive completely and permanently deleted. (P10 ("Pl.'s Spill Wipe Receipt"); Pl.'s Amend. Proposed Findings 25.) During trial, Plaintiff testified that he did not "think" about the OnBoard files until his attorney asked him about any OnBoard documents he might have, for purposes of responding to Defendants' document requests in this litigation. (June 7 Tr. 45:5-46:2.) According to Plaintiff, however, he never used any of the files to advance 7DS Associates. (*Id.* at 45:22-25; Pl.'s Spill Wipe Receipt.)

### 3.   *Analysis*

Defendants allege that Plaintiff removed information and documents from OnBoard's offices without authorization, despite repeated demands for the return of said information. (Defs.' Amend. Proposed Findings 28.) Accordingly, Defendants' counterclaim seeks imposition of a permanent injunction enjoining Plaintiff from directly or indirectly disclosing and/or using its confidential and proprietary information, and prohibiting any third-party and/or entity from using or disclosing its confidential and proprietary information. Despite an inference that Plaintiff was in possession of OnBoard materials for up to two years after his employment ended, Defendants "failed to clearly establish that [Plaintiff] *utilize[ed]* protected proprietary information." *NCN Co. Inc.*, 215 A.D.2d 737 (emphasis added). Consequently, no irreparable harm has been shown. While Plaintiff testified that he has no way of proving that he did not use the documents (June 7 Tr. 121:12-16), Plaintiff need not show this as it is the Defendants' burden to do so.

Furthermore, assuming the information in question that was removed was in electronic form, Plaintiff's failure to "return" the information also fails to rise to the requisite level of "irreparable injury," especially in the case where other remedies may be adequate. *A & G Research, Inc.*, No.

27

07-5870, 2008 WL 2150110, at *13 (internal citations omitted). Defendants have not shown that deleting the information in question is not an adequate remedy. Indeed, Plaintiff asserts that he deleted this information on May 20, 2011. (P10; Pl.'s Amend. Proposed Findings 25.) However, Plaintiff need not prove this, as he does not carry the burden of proof as to Defendants' counterclaim. Given that possession alone is insufficient to prove Defendants' counterclaim, the Court finds that Defendants have not proven by a preponderance of the evidence that Plaintiff actually used or appropriated any of OnBoard's proprietary information. Moreover, Defendants have failed to establish any of the elements necessary to warrant imposition of a permanent injunction, such as irreparable harm and inadequate, alternative remedies. As such, the Court finds that granting a permanent injunction would be inappropriate and thus, Defendants' motion must be denied.

### 4. *Defendants' Request for Attorneys' Fees*

Defendants seek an award of attorneys' fees, costs, and disbursements, incurred in connection with litigating their counterclaims.[20] (Defs.' Answer ¶ 64(a).) As the Court has found that Defendants did not sustain their burden of proof on the counterclaims, the Court finds that Defendants are not entitled to recover attorneys' fees, costs, and/or disbursements. *See Nestor v. McDowell*, 81 N.Y.2d 410, 411 (1993) (It is settled that only a prevailing party is ordinarily entitled to attorney's fees.); *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 257, 269-71 (1975) (The "American Rule" requires each party to bear its attorney's fees.).

---

[20] During the trial proceedings, Defendants also preserved the right to file a motion for excessive costs. (June 9 Tr. 49:22-50:8.) However, as Defendants failed to seek leave to file such a motion, the Court need not address the issue.

## IV.   CONCLUSION

Pursuant to Federal Rule of Civil Procedure 52(a), the court presents its findings of facts and conclusions of law.

### A.   *Findings of Fact*

This Opinion incorporates by reference all stipulated facts set forth in the Final Pretrial Order.  Based on the evidence presented at trial, this Court now makes the following findings of fact:

1. OnBoard is a limited liability company organized and existing under the laws of the State of New York, having a place of business located at 90 Broad Street, New York, New York.  Bednarsh is the President and Chief Operating Officer and Siden is the Chief Executive Officer of OnBoard, and both have been since 2002 when Onboard was founded.

2. OnBoard provides real estate data solutions and web services, as well as consulting services, to real estate, publishing, technology, and financial services companies.

3. Plaintiff is a graduate of Yale University and New York University School of Law. Plaintiff was employed by OnBoard as the Vice President of Marketing from September 17, 2007 until May 5, 2009.

4. The terms and conditions of Hahn's employment by OnBoard were set forth in the Employment Agreement, which both parties executed on September 19, 2007.

5. The Employment Agreement provides that Plaintiff would be entitled to specific payments in the event of his termination, namely: (a) severance pay in an amount equal to three months of his salary at the time of termination; and (b) the retention of certain rights, which are defined in the Employment Agreement as "Exit Event rights," and which give Plaintiff a share of the proceeds in the event OnBoard is sold

or otherwise undergoes a change of ownership.  The Employment Agreement provides that Plaintiff would forfeit his severance and his Exit Event rights under only two circumstances: (a) his voluntary resignation; or (b) his termination for "cause," as that term is defined in the Employment Agreement.  The Employment Agreement does not contain a post-employment covenant.

6.  Plaintiff and a number of OnBoard employees attended a Leading Real Estate Conference in Scottsdale, Arizona, from March 24, 2009 through March 28, 2009. Plaintiff helped to set up Defendants' display booth, held a video focus group, participated in sales meetings, and gave a sales pitch for OnBoard.

7.  Plaintiff reserved the domain name "7DSassociates.com" on or about April 27, 2009. Plaintiff also maintains a Weblog known as "notorious-rob.com" by means of which Plaintiff posts writings and comments of his views about the real estate industry.

8.  Plaintiff has a Personal Card for his website, which contains his personal e-mail address, his website address, cellular phone number, and Twitter account information, and it does not include contact information for OnBoard or any other business entity.  Plaintiff distributed his business card from OnBoard along with his Personal Card at the Conference.

9.  Defendants were aware of Plaintiff's use of social media, including his personal blog, to promote OnBoard, its brand and its products.

10. During the trial, no evidence was produced that Plaintiff pitched any business of his own in competition with Defendants at the Scottsdale Conference.  Plaintiff was not advised of any dissatisfaction on Defendants' part with his performance at the Conference at any time prior to May 5, 2009.

11. On May 5, 2009, Plaintiff attended a regularly scheduled status meeting with Siden and Bednarsh in Siden's office at OnBoard.  Plaintiff, Siden and Bednarsh were the only people in attendance.

12. Plaintiff registered 7DS Associates, LLC as a limited liability company in the State of New Jersey on May 6, 2009.

13. MRIS was a client of Defendants.   In a letter dated December 15, 2009, MRIS notified Defendants that it was terminating the agreement between the two companies.

14. Plaintiff rendered consulting services to MRIS during the latter part of December 2009 and was employed by MRIS from approximately January 2010 to May 2010.

**B.**      ***Conclusions of Law***

1. Plaintiff fully performed his contractual obligation under the Employment Agreement.  However, under New York law, Plaintiff has the burden of proving his claim by a preponderance of the evidence.  Plaintiff failed to prove to the Court by a preponderance of the evidence that Defendants terminated his employment without cause, a condition precedent to their obligation to vest Plaintiff with the Severance Package.  Thus, Plaintiff did not establish that Defendants breached the Employment Agreement.

2. The credible evidence introduced at trial in this action does not establish by a preponderance that Plaintiff failed to adequately represent and/or promote Defendants at the Conference.

3. As Plaintiff was no longer employed by Defendants after May 5, 2009, the preponderance of credible evidence does not support Defendants' claim of disloyalty in regard to the decision of MRIS to terminate its contract with Defendants.

4. Defendants' claim that Plaintiff induced or caused MRIS to terminate its business relationship with OnBoard while Plaintiff was employed by the company is not supported by a preponderance of the credible evidence.

5. As there is no post-employment restrictive covenant in Plaintiff's Employment Agreement, Plaintiff did not breach his Employment Agreement or his duty of loyalty to Defendants in providing services to MRIS after the termination of his employment by Defendants.

6. The preponderance of credible evidence does not support Defendants' claim that Plaintiff conducted personal business during working hours, which would constitute a violation of Plaintiff's duty of loyalty.

7. The preponderance of the evidence does not support Defendants' claim that Plaintiff committed theft or diverted corporate assets and/or opportunities from OnBoard.

8. Defendants did not establish by a preponderance of the evidence that after the termination of Plaintiff's employment, Plaintiff accessed or used OnBoard's material, disseminated it to any other person or made use of it for his own business or personal purposes.

9. The preponderance of the evidence produced in this action does not support that Plaintiff intentionally disclosed Defendants' confidential information.

An appropriate Order follows.

_____
HONORABLE MICHAEL A. SHIPP
UNITED STATES MAGISTRATE JUDGE

**CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Robert Hahn,                          :        Civil No. 09-3639 (MAS)
                                      :
                    Plaintiff,        :
                                      :
         v.                           :        **ORDER OF JUDGMENT**
                                      :
OnBoard, LLC, Jonathan Bednarsh, and  :
Marc Siden,                           :
                                      :
                    Defendants.       :
                                      :

    This Court having conducted a **bench trial** and having stated its **findings of fact and conclusions of law** in the accompanying Opinion, pursuant to *Federal Rule of Civil Procedure 52(a)*, and for good cause shown,

    IT IS on this **5th** day of **October, 2011,**

    **ORDERED THAT:**

1. Plaintiff's breach of contract claim is denied and dismissed with prejudice;

2. Defendants' breach of the duty of good faith and loyalty counterclaim is denied and dismissed with prejudice;

3. Defendants' breach of contract counterclaim is denied and dismissed with prejudice;

4. Defendants' counterclaim seeking a permanent injunction is denied and dismissed with prejudice; and

5. The matter is dismissed with prejudice in its entirety and shall be closed by the Clerk of this Court.

**HONORABLE MICHAEL A. SHIPP**
**UNITED STATES MAGISTRATE JUDGE**

33